[Civil No. 3371.   Filed February 19, 1934.]

[29 Pac. (2d) 722.]

GENARO FOURZAN and H. S. STEPHENSON, Trustees, Appellants, v. EARNEST C. CURTIS and FRANCES E. CURTIS, Appellees.

Mr. D. B. Morgan, Mr. C. B. Wilson and Mr. O. C. Compton, for Appellants.

Mr. F. M. Gold and Mr. H. L. Russell, for Appellees.

LOCKWOOD, J. — Genaro Fourzan and H. S. Stephenson, as trustees, hereinafter called plaintiffs, brought suit against Earnest A. Curtis and Frances E. Curtis, his wife, hereinafter called defendants, to enjoin the latter from interfering with a certain pipe-line and water improvements belonging to plaintiffs, and with their free and uninterrupted use of certain water, and for damages for the previous destruction of the pipe-line in question by defendants. Defendants answered, claiming that they were entitled to the beneficial use of the water in controversy by reason of an appropriation thereof, and prayed that plaintiffs be enjoined from interfering with their rights. The case was tried to the court sitting with a jury, and certain interrogatories were submitted to and answered by the jury. The court thereupon, impliedly adopting the answers to certain of the interrogatories, but without finding facts of its own, rendered judgment that defendants were entitled to the use of the water in question, and enjoined plaintiffs from interfering with such use, whereupon this appeal was taken.

There are some seventeen assignments of error, but the legal questions presented thereby are such that we feel we can determine them more logically and intelligibly by considering the issues which appear, upon the whole record, to be decisive of the case. The pleadings show, in substance, that this is

a controversy between the parties over the right to use certain waters which have their origin in a place called by the parties, and which we shall call, "South Grass Seep," situated in that portion of the state north of the Grand Canyon of the Colorado. Plaintiffs claim the right to use the waters for two reasons: (a) That their predecessor in interest made a valid appropriation thereof in 1917 under the water law of Arizona, and has continued using the same beneficially at all times previous to the date of this action; (b) that if it appear, as a matter of fact and law, that such waters are not subject to the law of prior appropriation, but are percolating in their nature, and therefore belong to the owners of the land where they appear, plaintiffs are such owners. Defendants base their right solely on the contention that the waters are and have been, at least since the year 1921, subject to prior appropriation, and, while admitting that plaintiffs did commence to use such waters beneficially in 1917, claim they had abandoned their use for more than five years before they were appropriated by defendants.

We consider first what waters are subject to appropriation under the law of Arizona. Chapter 64 of the Session Laws of 1921 contains the latest enactment of the legislature on that point. They are stated therein as "the water of all sources of supply, flowing in natural streams, canyons, ravines or other natural channels 'or in definite underground channels, whether perennial, intermittent or flood waters, waste or surplus water, and of lakes, ponds and springs on the surface." It is admitted by both parties that, if these waters are subject to appropriation at all, it is as "springs on the surface," and not otherwise, for neither contends they come under any of the other mentioned classes.

We consider then what is meant by the phrase "springs on the surface," as found in our law. In

the first place, we are of the opinion that the word "natural" was meant by the legislature to limit all of the different sources of water subject to appropriation, and that, if any of those mentioned are of artificial origin, that law does not authorize their appropriation. While any appropriable waters may be collected, stored or carried in artificial reservoirs, channels and conduits, the test of the right of appropriation, both in quantity and quality, depends on their natural condition, and not on what may occur after that condition is artificially changed.

What, then, is a natural "spring on the surface"? The word "spring," when standing alone, has been given many definitions in accordance with the facts of the particular case. It is the contention of defendants, in substance, that any water appearing on the surface of the ground in sufficient quantity to moisten it is an appropriable spring, and they cite one case which they urge supports their position. *Harrison* v. *Chaboya,* 198 Cal. 473, 245 Pac. 1087. In that case a deed conveyed "all of that certain spring and water flowing therefrom . . . particularly described as follows, to wit: 'All the water issuing from our spring, which spring is located on the west end of a certain tract of land,' " describing certain premises owned by the grantor. It appeared that in those lands there was a wooden box four feet square at the foot of a tree, which was apparently within the area of a boggy and marshy place where an amount of water which underlay and percolated through the tract of land upon which the same was situated came to the surface thereof, occupying an area at the point of its exudation about forty feet square. The box referred to had been sunk within this damp or marshy area with a view, apparently, to collect the waters which arose thereon, and, in order to aid in such collections, wooden troughs or drains had been constructed leading into this central receptacle and out of which, by

piping, the waters thus assembled were conveyed to the premises of the grantee. Some time before the inception of the litigation, the grantees, in order to increase the flow of water into the receptacle just described, had installed another wooden box about two feet square, some forty feet from the first one, and had led the waters collected therein by means of an iron pipe into the first box. The litigation arose over the right of the grantees to the waters thus last collected. It was their contention that the waters collected from both boxes were from the same source, and, as such, embraced within the terms of the conveyance. It was the contention of grantors that the waters so collected were from an entirely different and separate source, and not included within the original grant. The question was submitted to the court, and it said:

" . . . The term spring in its common acceptation, at least in California, is a term which in general usage has been applied to a damp, marshy or boggy area, usually of small but definite extent, wherein underground waters from a larger tract of land find their way to the surface thereof, and make their presence known either by a definite outflow or by the surface presenting such a quantity thereof as will render practicable their assembling in such receptacles as those described in the record herein as box A and box B. . . . "

We are of the opinion that, under the peculiar circumstances of the case involved, the Supreme Court of California was justified in holding that the conveyance in question did use the word "spring" in the sense it was defined by the court, but we think it has no bearing on the present case.

So far as we know, there is no state recognizing the doctrine of prior appropriation which has named as one of its appropriable waters "springs on the surface," except Arizona. Before 1919, unless a

spring rose to the dignity of the source of a running watercourse, its waters were not appropriable at all under our law. *Howard* v. *Perrin,* 200 U. S. 71, 26 Sup. Ct. 195, 50 L. Ed. 374; *McKenzie* v. *Moore,* 20 Ariz. 1, 176 Pac. 568. In that year the legislature added "springs" to the list of appropriable waters. Chapter 164, Sess. Laws 1919. But this was modified two years later by the limitation, "on the surface." Evidently the legislature did not intend, in 1921, that all "springs" should be subject to appropriation. Can we determine their meaning when they added the limiting phrase "on the surface"? It seems to us it is obvious. The only reasonable explanation is that they intended to reiterate the general principle that appropriable waters were only those in their natural condition, and that, realizing the common practice in Arizona of the artificial development of percolating subterranean waters to increase the surface flow of a spring, they meant to prohibit any attempt to evade the long-established rule in Arizona that percolating waters were not subject to appropriation. We hold, therefore, that the phrase "springs on the surface" refers only to the waters which emerge from the earth without artificial assistance, and that no appropriation can be made of percolating waters developed through the means of tunnels, cuts, wells or other artificial structures, even though those waters may by such structures be brought to the surface at the place where a "spring on the surface" already exists.

Let us apply this law to the facts, as shown by the evidence in the present case. The only testimony dealing with the condition of the water at "South Grass Seep," as it was originally, is found in the testimony offered by plaintiffs, and this dates back to the year 1917. At that time, to quote the testimony of Charles Lewis, South Grass Seep was "just a small damp place on the side of the mountain and

quite a little grass around it, and it had the appearance that there might be some water developed there.'' There is not a scintilla of evidence in the record contradicting this description of South Grass Seep, as it originally existed. It is obvious that, while there might be a ''spring'' there in the sense used by the California court in *Harrison* v. *Chaboya, supra,* as ''a damp, marshy or boggy area usually of small but definite extent,'' there was no ''definite outflow'' of water; it being at the most a ''surface presenting such a quantity thereof as will render practicable their assembling in such receptacles as those described in the record.'' It is evident that South Grass Seep, in its original condition, was only a ''spring'' in the sense that it indicated that artificial development might produce a sufficient quantity of water to apply to beneficial use.

A *sine qua non* to a valid appropriation of water, under our law, is that it shall be applied to some beneficial use. It would seem to follow as a corollary that an amount of water which cannot be applied to such a use is not subject to the law of appropriation, and the undisputed testimony shows that it is doubtful if South Grass Seep, in its original condition, produced enough water on the surface so that it could be even gathered and carried away in cups, let alone through trenches or pipes in the ordinary manner.

Even the evidence of defendants and their witnesses, taken in the most favorable manner in their behalf, shows that it was only through the collection of the underground percolating waters of the Vermilion Cliffs, by means of a tunnel and an open cut, that enough water could be collected to supply, even through a pipe-line, a quantity which never exceeded a gallon per minute, and frequently dropped below two pints. We are of the opinion that, on the record as a whole, the waters at South Grass Seep were not subject to appropriation, for the reason that in their

natural and undeveloped state they were not sufficient in quantity to apply to any beneficial use.

Neither plaintiffs nor defendants, therefore, could claim any right to the waters of South Grass Seep, by reason of appropriation thereof under the law of Arizona, and any affirmative judgment in favor of defendants cannot be sustained by the evidence contained in the record.

We consider next whether there was evidence justifying a judgment in favor of plaintiffs. It will be observed that they claimed the water, both by reason of the law of appropriation and by reason of ownership of the lands where it was found. The first claim, of course, is untenable. Let us consider the second. The waters of South Grass Seep, so far as they were capable of being conveyed therefrom, were in their origin percolating in their nature, and developed by means of a tunnel and open cut. It is the law of Arizona that percolating waters belong to the owner of the land on which they are found. *Howard* v. *Perrin, supra; Maricopa County Municipal Water Conservation District No. 1* v. *Southwest Cotton Co.,* 39 Ariz. 65, 4 Pac. (2d) 369. And he may convey them to other premises than those on which they are originally found, provided no other rights are injured thereby. *Cohen* v. *La Cañada etc. Co.,* 151 Cal. 680, 91 Pac. 584, 11 L. R. A. (N. S.) 752.

Who, then, owned the land in question? On August 30, 1932, plaintiffs' predecessors in interest filed in the United States Land Office at Phoenix, Arizona, a script or lieu selection of these lands, and a Land Office receipt was duly issued by the Land Office, showing the payment of the fees required by law at the time of selection. This selection was made under the provisions of the acts of Congress of May 23, 1930 (46 Stat. 378), and February 21, 1931 (46 Stat. 1202), which authorize the exchange by applicants of

lands of a certain character which they already possess for certain other lands. It is not disputed that the law on August 31, 1932, authorized parties complying therewith to acquire land of the character of that on which South Grass Seep was situated in this manner, and that plaintiffs, before the filing of their second amended complaint, were the equitable owners of that land, in so far as their selection thereof and reconveyance to the government of those lands in lieu of which the selection was made, and the issuance of the Land Office receipt for the premises in question would make them such. The Land Office has held that, when the law provides for the relinquishment of land contained in a forest reserve and the selection of lieu land, when the deed of relinquishment has been made, the lieu lands selected and receipt issued therefor, the selector has a vested right in the property so selected, and no act of either the executive or legislative branch of the government can divest him of such right, and that the right once vested is for most purposes equivalent to a patent, and, when the latter is issued, it relates back to the time when the right became fixed. *Gideon* v. *McDonald*, 30 Land Decisions 124; *Kern Oil Co.* v. *Clark*, 30 Land Decisions 550. The Supreme Court of the United States has held that, where a party has selected land and fully complied with all the conditions imposed by the government precedent to such selection, it is not like the initial step of one who wishes to obtain the title to public land by future compliance with the law, such as a homestead entry, but is the concluding step of one who by full compliance with the law has earned the right to receive the title. *Payne* v. *Central Pacific Ry. Co.*, 255 U. S. 228, 41 Sup. Ct. 314, 65 L. Ed. 598; *Payne* v. *New Mexico*, 255 U. S. 367, 41 Sup. Ct. 333, 65 L. Ed. 680; *Wyoming* v. *United States*, 255 U. S. 489, 41 Sup. Ct. 393, 65 L. Ed. 742. We are therefore of the opinion that plaintiffs

are the equitable owners of the land on which the said South Grass Seep is located, and entitled, as such owners, to all the developed percolating waters on said land, with the right to convey them to such place as they please without interference from other parties, subject, of course, if such conveyance is over the land of other parties, to the proper securing of a right of way therefor.

It is urged by defendant that, because in the second amended complaint the waters in question were characterized as "South Grass Seep or Springs," it is an admission that they were a "spring on the surface," and therefore subject to appropriation. Even assuming that such phraseology was an admission by plaintiffs that the waters in question were a "spring," we think it does not go so far as an admission that they were a "spring on the surface," and what we have previously said disposes of that issue. We need not discuss the other matters raised on the appeal. For the foregoing reasons, the judgment of the superior court of Coconino county is reversed, and the case remanded for a new trial in accordance with the rules laid down herein.

ROSS, C. J., and McALISTER, J., concur.