550 P.2d 227

**W. W. JARVIS, for and on behalf of himself and other persons or legal entities constituting a class too numerous to be named as parties, Petitioners,**

v.

**The STATE LAND DEPARTMENT, a Department of the State of Arizona, Obed M. Lassen, State Land Commissioner of the State of Arizona, and CITY OF TUCSON, a municipal corporation, real party in interest, Respondents.**

No. 9488.

Supreme Court of Arizona,
In Banc.

May 27, 1976.

Bruce E. Babbitt, Atty. Gen., Phoenix, for respondent State Land Department.

James D. Webb, Tucson City Atty., by Robert O. Lesher, Special Counsel, Tucson, for respondent City of Tucson.

Elmer C. Coker, Phoenix, Russo, Cox, Dickerson & Cartin, by Russell Russo, Tucson, for petitioners.

STRUCKMEYER, Vice Chief Justice.

This is an original petition by the City of Tucson requesting this Court to modify a permanent injunction heretofore issued in this cause on July 17, 1969. The petition is a continuation of the dispute *Jarvis v. State Land Department, et al*, 104 Ariz. 527, 456 P.2d 385 (1969), and *Jarvis v. State Land Department*, 106 Ariz. 506, 479 P.2d 169 (1970).

In December 1968, W. W. Jarvis, on behalf of himself and others who cultivated 33,000 acres of land in the Avra-Altar Valleys by pumping percolating well waters, filed an action directed primarily against the City of Tucson. Tucson had drilled certain water wells in the Avra Valley some 15 to 18 miles from Tucson and was preparing to transport the waters pumped therefrom to Tucson for use by its municipal consumers. We held that pumped waters may not be conveyed off the lands from which they were pumped if the property owners overlying the common source of supply were injured or damaged thereby, and because the Avra-Altar Valleys were a critical water area, we issued an injunction which, in effect, forbade the transportation of water out of those Valleys to Tucson.

In the second *Jarvis* decision, on application of Tucson we decided that because the Legislature had fixed the relative value of uses in appropriable waters as, first, domestic and municipal and, second, irrigation and stock watering, there was evidenced a legislative determination that the needs of municipalities in water were superior to agriculture. We held that we would modify the decree issued in the first *Jarvis* decision if Tucson purchased lands within the Avra-Altar Valleys under cultivation and used the water formerly used for growing crops as a source of supply for municipal customers, saying:

> "Tucson may withdraw an amount equal to the annual historical maximum use upon the lands so acquired." 106 Ariz. at 511, 479 P.2d at 174.

Tucson by the present petition asserts that it has acquired lands within the Avra-Altar Valleys and asks this Court to modify the permanent injunction heretofore issued prohibiting it from transporting water out of the Avra-Altar Valleys. It is alleged that the owners of the farms purchased by Tucson had acquired by historical use the right to irrigate for agricultural purposes not less than 4.4 feet of water per acre per year. Jarvis questions the asserted use of 4.4 acre feet per year as the correct amount which Tucson may transport out of the Valleys.

We appointed The Honorable Porter Murry, Judge of the Superior Court (Retired), as Master, and directed him to hold hearings and receive evidence and, having done so, report to the Court his findings on certain specified issues of fact. After conducting such hearing and receiving evidence on the questions posed in the order of referral, findings were returned to this Court by the Master. The question now to be resolved is the quantity of water which Tucson, after having retired certain parcels of land from cultivation, is entitled to take.

█ It should be immediately understood that the second *Jarvis* decision authorizing Tucson to retire lands from cultivation in the Avra-Altar Valleys and withdraw water for its municipal uses was expressly predicated on equitable considerations, there being no precedent for such a procedure in the American doctrine of reasonable use. Tucson acknowledges that equitable considerations require that the agricultural users of the water underlying the Avra-Altar Valleys should be no worse off than they would have been had the lands retired by Tucson remained in private use, dedicated to the cultivation of crops. Tucson's right to pump and transport water out of the Avra-Altar Valleys is to be measured by the acreage previously farmed and not by the gross acreage of the land purchased.

█ Tucson does not question the basis for determining acreage. Its position is

that the words "annual historical maximum use" set forth in the second *Jarvis* decision permits the City to pump and transport out of the Valleys the greatest (maximum) amount of water used in any year in the farming of a parcel purchased by the City. We do not think Tucson's interpretation of our language is correct.

We agree with Tucson that the word "maximum" means the greatest amount. It is plain, however, that Tucson's interpretation would result in a withdrawal of more water from the common supply than had been withdrawn by the previous users and, consequently, would be an inequitable withdrawal favoring Tucson as against the others whose lands overlie the common supply. The word "historical," in the term "annual historical maximum use," is used in the sense of "based on or dealing with history" or "true to history: accurate in respect to history." Webster's Third International Dictionary. It introduces the concept of a period of time, so that "maximum" would not be confined to the greatest use of any single year, but would be the average of the annual maximum amount of water used. The word "maximum" as used in the formula prescribed in the second *Jarvis* decision was not used as a contrast to the minimum or any amount other than the largest quantity which could have legally been and actually was used.

A second area of dispute concerns the meaning of the word "use," as it pertains to underground recharge. Factually, the situation is described by respondent as:

"The earth lying between the water table and the surface can be thought of as a column bounded laterally by the boundaries of the farm on the surface. That column of earth is originally more or less dry. It thus has the capacity to absorb or 'soak up' water which, applied to the surface, is not used by plants there but instead soaks into the soil. As more and more water is applied to the surface in excess of that required for the consumptive use of the crops in cultivation, the soil below the surface absorbs into itself as much of that water as is required to cause the soil to reach what is called its 'field capacity.' When field capacity of the soil at the top of the column of earth, just below the surface, is reached, the excess water passes down through that part to the soil below and is held there until that part below reaches its own field capacity, and so on down until the entire column, surface to water table, has reached its field capacity. When the field capacity of the entire column has been reached, excess water applied to the surface passes down through the column and reaches the water table where it constitutes one form of recharge of the water supply."

The testimony is that in the part of the valley in which Tucson has retired lands from cultivation, the soil down to the water table has reached field capacity, so water applied at the present time to the surface beyond the needs of the growing crops returns to the water table. The Master found:

"A consequence of the prevalence of that condition down to the water table is that at the present time, and for some substantial period of years in the future, almost all of the water applied to the surface of these parcels in excess of that beneficially used by growing crops would be returned to the water table, 'field capacity' being that state of the soil in which added water cannot be retained within the soil itself but instead must return by gravity to the underlying water table."

Jarvis argues that Tucson should be permitted to use no more than that quantity which, were the lands in cultivation, would not return to the water table. This amount is known as the consumptive use. Tucson acknowledges that there is logic and justice in Jarvis' position yet argues this is not what the Court should adopt. Tucson argues that the amount of water used on a parcel of land can be readily determined from evidence of planted acreage which is, in general, available for every

farmer, and the experts in hydrology, knowing the efficiency factor of each farm and the consumptive use of water by a crop, can make a determination quickly and inexpensively. Tucson argues that there is no way that the field capacity of a parcel of land and, hence, the amount of recharge can be determined inexpensively and with reasonable ease and quickness. Wells must be dug and soil samples must be taken and analyzed. If the use of a parcel of land has not been long enough or enough water applied to it to permit the whole column of underlying earth to reach field capacity, the investigative process must be repeated indefinitely into the future. Tucson also argues that to adopt the view of the farmers by incorporating the concept of recharge as a limitation on the City's right to transport water extends unreasonably the already generous protection afforded the farmers by the Court's earlier decisions.

On the other hand, Jarvis argues that if Tucson is authorized to withdraw the total amount of water applied to the land rather than the amount consumptively used, it would be withdrawing twice as much as was actually used, because the evidence establishes that one-half of the water that the farmers pumped went back into the ground. This, Jarvis argues, would result in a critical loss of ground water storage and would be contrary to the clear intention of the Legislature when it enacted the ground water code in 1948, see A.R.S. § 45–301, et seq., as amended, because under the ground water code, critical ground water areas are created for the reason that the annual recharge within the area is not sufficient to supply the existing users at the current rates of withdrawal. The evidence also establishes that in the Avra-Altar Valleys it takes 20 years of application of water to new farm lands before they reach field capacity; that all the lands have reached field capacity because the area has been declared critical since 1954, and no new lands have since been brought into production.

We think it is apparent from an examination of our previous decisions that this Court did not intend to permit the transportation of water from a critical area where such transportation would tend to exhaust the common supply to the detriment of established users. For this reason, we hold that Tucson may pump and transport out of the Avra-Altar Valleys an amount of water equal to the annual historical maximum use on the parcels of land it has retired from cultivation. In this respect, the word "use" is interpreted to mean consumptive use.

The findings of the Special Master are approved and it is ordered that the injunction heretofore issued shall be modified to conform with the findings and this decision.

CAMERON, C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.