558 P.2d 14

**FARMERS INVESTMENT COMPANY, a corporation, Appellant,**

v.

**Andrew L. BETTWY, as State Land Commissioner, and the State Land Department, a Department of the State of Arizona, and Pima Mining Company, a corporation, Appellees.**

**FARMERS INVESTMENT COMPANY, a corporation, Appellant,**

v.

**The ANACONDA COMPANY, a corporation, Amax Copper Mines, Inc., the Anaconda Company as partners in and constituting Anamax Mining Company, a partnership, Appellees.**

**CITY OF TUCSON, a Municipal Corporation, Appellant,**

v.

**ANAMAX MINING COMPANY, and Duval Corporation and Duval Sierrita Corporation, Appellees.**

No. 11439–2.

Supreme Court of Arizona, In Banc.

Aug. 26, 1976.

Snell & Wilmer by Mark Wilmer, Loren W. Counce, Jr., Phoenix, for Farmers Investment Co.

Bruce E. Babbitt, Atty. Gen. by Peter C. Gullatto, Phoenix, for State of Arizona.

Musick, Peeler & Garrett by Bruce A. Bevan Jr., Los Angeles, Cal., Verity & Smith by John C. Lacy, Tucson, for Pima Mining Co.

Chandler, Tullar, Udall & Richmond by Thomas Chandler, Tucson, for Anaconda Co.

James D. Webb, Tucson City Atty., Robert O. Lesher, Tucson, for City of Tucson.

Fennemore, Craig, Von Ammon & Udall by Calvin H. Udall, Phoenix, for Duval Corp.

STRUCKMEYER, Vice Chief Justice.

On November 24, 1969, Farmers Investment Company, herein called FICO, filed a complaint naming certain mining companies as defendants. Among those named in its amended complaint filed November 8, 1973, were the Anamax Copper Mining Company, The Anaconda Company, the Amax Copper Mines, Inc. and Pima Mining Company, the Duval Corporation and the American Smelting and Refining Company. Subsequently, Andrew L. Bettwy, State Land Commissioner, and the State Land Department of the State of Arizona were added as parties defendant. The City of Tucson, a municipal corporation, became a party by intervention. The three appeals in this case are from the granting or denial of summary and partial summary judgments. We ordered the appeals consolidated for decision.

THE APPEAL OF FARMERS INVESTMENT COMPANY AGAINST THE ANAMAX COPPER MINING COMPANY, THE ANACONDA COMPANY AND THE AMAX COPPER MINES, INC.

The Anamax Copper Mining Company is a partnership consisting of the Anaconda Company and Amax Copper Mines, Inc. It is engaged in mining and milling low grade copper deposits in Pima County, Arizona. Farmers Investment Company, plaintiff in the court below, herein called FICO, is the owner of approximately 7,000 acres of irrigated land in Pima County, south of Tucson in the Santa Cruz Valley. Its lands have been irrigated for agricultural purposes for many years, some as long as prior to 1915. All of such lands are located within the Sahuarita-Continental Critical Groundwater Area, as designated by the State Land Department on October 14, 1954 pursuant to A.R.S. § 45–308. FICO has irrigated its farm lands and used for domestic purposes the percolating waters lying below the surface of the lands by pumping water from wells located on its lands. In addition to the irrigated lands of FICO, there are other lands within the Sahuarita-Continental Critical Groundwater Area which are irrigated by pumped waters. FICO pumps approximately 38,500 acre feet annually. Other land owners within the area use an additional amount of approximately 15,000 acre feet per year. The annual recharge of water within the critical area is substantially less than the amount used for agricultural purposes and the water table has been for many years gradually lowering and the reservoir of supply has been gradually depleting.

On November 24, 1969, FICO filed its original complaint. In its amended complaint it alleged that appellees had acquired well sites in the Sahuarita-Continental Critical Groundwater Area and were pumping water outside the area onto lands other than those from which the waters were being pumped; that all defendants in the court below were thus pumping approximately 25,000 acre feet of water yearly. It was alleged that the use by appellees of these percolating waters in their mining operation was unreasonable and in violation of the rights of FICO; that if the use of the appellees continued, the percolating waters under FICO's lands would become exhausted or lowered to the point at which

it would be economically unfeasible to irrigate said lands and they would revert to barren desert. FICO prayed that the Superior Court enter a judgment permanently enjoining appellees from taking the waters beneath the critical groundwater area and using it on lands other than those from which the waters have been taken, and that a decree be entered declaring the rights of the respective parties in and to the waters underlying the Sahuarita-Continental Critical Groundwater Area.

FICO also complained that because of the depletion of the groundwater supply by appellees FICO has been required to deepen its wells, lower its pump bowls and in some instances construct replacement wells, and that the added lift of groundwater from the lowered water table has cost and will cost FICO additional expense in power, labor and maintenance of its wells; that the fair market value of FICO's property and lands has been damaged to an amount in excess of fifty million dollars.

The appellees answered appellant's complaint, asserting that they have the right to use the water pumped from under the Sahuarita-Continental Critical Groundwater Area and that they have the right to continue and extend such use into the future. They claim as an affirmative defense that FICO has been guilty of laches in bringing its claims against the appellees and therefore is not entitled to the relief sought. Appellees also counterclaim against FICO, alleging that they were putting the waters which they pumped to the beneficial and reasonable use for mining, milling and industrial uses; that the water table within the basin has been for many years gradually lowering and the reservoir of supply has been gradually depleting; that FICO's use of percolating waters in connection with the operation of its farm was unreasonable and in violation of appellee's rights in that water was being wasted by FICO and FICO was not utilizing reasonable methods to conserve such water.

While the action was pending trial, FICO on April 15, 1974 moved for immediate injunctive relief, asserting that Anamax was engaged in the mining and milling of copper ores, its mill being located approximately four miles west of the farm lands of FICO; that FICO's farm lands were located within the Sahuarita-Continental Critical Groundwater Area south of Tucson, which includes a major part of what is generally referred to as the upper Santa Cruz basin; that Anamax's mine and mill were located one mile west of the west boundary of the Sahuarita-Continental Critical Groundwater Area; that FICO's farm consisted of two tracts of land, roughly rectangular in shape, approximately one and one-half miles apart, lying in the valley of the Santa Cruz River; that Anamax, prior to filing this litigation, constructed several large water wells in the critical area, equipped such wells with large pumps powered by electrical energy and transported the waters therefrom to its mine and mill; that Anamax was planning to enlarge its ore treatment facilities from the capacity of 30,000 tons per day to 40,000 tons per day and otherwise enlarge its operation, which would require 6,000 acre feet of additional water annually; that Anamax was presently engaged in drilling a well to the proposed depth of 1,000 feet, 32 inches in diameter at the collar, in order to supply the water requirements of Anamax arising from its increased ore treatment. This well was being drilled almost equal distance between the boundaries of FICO's two tracts. FICO prayed for relief that Anamax be permanently restrained from completion and use of this well for the purpose described or for any use other than a beneficial use on the land from which the water is withdrawn.

Appellees answered FICO's motion, admitting that they proposed to continue to use the water so pumped and that some of the water was used on lands outside of the critical area. They asserted they intend to increase their pumpage in the future. Appellees acknowledged that there was a depletion of the percolating waters under FICO's lands but answered that the deple-

tion was jointly being caused by FICO, the appellees, the City of Tucson, and others. Appellees acknowledged that their land was located one mile west of the west boundary of the Sahuarita-Continental Critical Groundwater Area, and that it used large quantities of water in its milling operations. It did not, however, admit that the actual use of a substantial part of such water is outside the critical area. Appellees also admitted that they were engaged in drilling the water well described [1] by FICO, but asserted that its intended depth was 1,800 feet rather that 1,000 feet, and that the additional water supply so obtained would be pumped in part to the mill located outside the critical area, but that the bulk of such water would be returned to the critical area in tailings. They therefore alleged that "any use of said water outside of said critical area is de minimus, using the term 'use' to mean consumptive use." Other defenses were also asserted with which this Court, at least at present, is not concerned.

On May 21, 1974, the Superior Court in response to a motion by Anamax for partial summary judgment against the City of Tucson, intervenor, granted such judgment and made this finding:

"2. Water may be pumped from one parcel and transported to another parcel if both parcels overlie a common basin or supply and if the water is put to a reasonable use."

The following day, on May 22, 1974, after hearing arguments on FICO's motion for preliminary injunction, the Superior Court stated, in effect, that consistent with its ruling of the day before it would deny FICO's application for a preliminary injunction. The injunction was denied "sole-

ly on that basis" and a written order was signed and filed on May 24, 1974. This latter order is the basis of the present appeal.

In denying FICO's application for a preliminary injunction, it is clear that the court erred. Before, however, examining the law applicable, certain of the more significant facts should be emphasized. That portion of the Santa Cruz basin involved in this litigation lies south of the City of Tucson to the Santa Cruz County line, a distance of more than 30 miles. The Santa Cruz Valley and its groundwater basin is between north-south trending mountain ranges on the eastern and western boundaries of the Santa Cruz Valley. FICO's farm consists of two separate parcels, roughly rectangular in shape, each approximately one to one and one-half miles wide and about six miles long, called, respectively, the Continental Farm and the Sahuarita Farm. They lie in the bottomlands of the Santa Cruz groundwater basin about two miles apart and within the Sahuarita-Continental Critical Groundwater Area. Their long axis extends north and south. The farmed area of the two farms is principally planted to pecan trees, in a pecan planting program which began in 1965 and which was completed a few years ago.

The Anamax mine pit lies approximately three and one-half miles west of FICO's Sahuarita Farm. It is within the critical groundwater area, but the Anamax mill is located approximately one mile north and one and one-half miles west of the west boundary of the critical area and is, thus, outside the critical area. The wells from which Anamax derives the water for use in its milling operations are within the Santa Cruz basin between FICO's two farms. It

---

1. Anamax states in its answering brief before this Court:
   "2. As to FICO's Question No. 2, ANA-MAX conceeds [sic], that where certain lands are included in a critical groundwater area, further withdrawals will lower the water table in that area, depending on the extent of the overdraft to begin with and on the extent of the subsequent withdrawal.

   To the degree that such increases the pumping lift, it is fair to conclude that the landowners in the area are 'damaged' or injured. However, whether this damage is *damnum absque injuria* on the one hand, or 'legal damage' on the other, must be determined under the doctrine of reasonable use."

pumps the water withdrawn from the Santa Cruz Valley groundwater basin some four miles to its mill. There is no claim that there is a supply of groundwater underlying the Anamax mill sufficient in quantity to supply the water required for its milling operation.

This suit was originally filed in November of 1969. In April of 1974, Anamax began drilling the first of two additional wells by which it proposed to increase its groundwater use by increasing its daily milling capacity from 30,000 to 40,000 tons of ore and by putting into operation an oxide ore treatment plant to treat 10,000 tons of ore. This would increase its water use approximately 6,000 acre feet annually.

■ The question presented for decision is whether the doctrine of reasonable use as it has heretofore been judicially determined in Arizona permits percolating waters to be used off the lands from which they are pumped if thereby others whose lands overlie the common supply are injured or damaged thereby.

The principles controlling in this case have been set forth in detail and in unequivocal language by this Court in many decisions. Twenty-three years ago, on March 14, 1953, the Court published its decision on rehearing in Bristor v. Cheatham, 75 Ariz. 227, 255 P.2d 173 (1953), in which it committed Arizona to the American doctrine of reasonable use. The decision emphasized that this State had adopted the principle of reasonable use 49 years before, and that whether the Court should after nearly 50 years under an announced rule depart from it depended upon many questions, the most important of which was the protection of property rights acquired upon the faith of the Court's pronouncement of the law. Our exact language was:

"[M]any and large investments have been made in the development of ground waters. Under these circumstances the court's announcement of the rule becomes a rule of property, * * * and when a decision does become a rule of

property, the rights acquired thereunder are entitled to protection under the law as declared." 75 Ariz. at 231, 255 P. 2d at 175.

In Bristor, the Court held that whether the appellant Bristor's complaint which had been dismissed in the lower court stated a cause of action depended upon whether the Court was to follow the English common law

"that the owner of lands overlying subterranean waters may extract the same for any purpose he chooses with a resulting damage to an adjoining owner without liability therefor or whether we adopt what is called the American rule that one may extract such water for a reasonable, beneficial use of the land from which the same is taken." (Emphasis supplied) 75 Ariz. at 235, 255 P. 2d at 178.

The Court noted that this question was specifically reserved for future consideration 22 years before in Maricopa County Water Conservation District No. 1 v. Southwest Cotton Company, 39 Ariz. 65, 4 P.2d 369 (1931). The Bristor Court then addressed itself to that question.

In doing so, language from Rothrauff v. Sinking Spring Water Co., 339 Pa. 129, 14 A.2d 87 (1940) was quoted.

"' * * * the modern decisions are fairly harmonious in holding that a property owner may, not concentrate such waters [subterranean] and convey them off his land if the springs or wells of another landowner are thereby damaged or impaired.'" (Emphasis supplied) 75 Ariz. at 236, 255 P.2d at 178.

Language was also quoted from Canada v. City of Shawnee, 179 Okl. 53, 64 P.2d 694 (1936), that the doctrine

"'"does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it thereby result that the owner of adjacent or neighboring land is interfered with in his

right to the reasonable user of subsurface water upon his land, or if his wells * * * are thereby materially diminished in flow. * * *." ' " (Emphasis supplied) 75 Ariz. at 238, 255 P.2d at 180.

And the Court concluded:

"This rule does not prevent the extraction of ground water subjacent to the soil so long as it is taken in connection with a beneficial enjoyment of the land *from which it is taken*." (Emphasis supplied) 75 Ariz. at 237–238, 255 P.2d at 180.

The holding on rehearing in *Bristor* was explicitly affirmed 16 years later in 1969 in the first decision in *Jarvis v. State Land Department*, 104 Ariz. 527, 456 P.2d 385 (1969). In the second *Jarvis* decision in 1970, three years before Anamax commenced the drilling of the well about which FICO complains, the doctrine was made incontrovertibly clear by our pronouncement, supported by substantial authority:

"Percolating waters may not be used off the lands *from which they are pumped* if thereby others whose lands overlie the common supply are injured.

\* \* \* \* \* \*

Such waters can only be used in connection with the land *from which they are taken*." *Jarvis v. State Land Department*, 106 Ariz. 506, 508, 509, 479 P. 2d 169, 170, 171 (1970). (Emphasis supplied)

Appellee nonetheless argues that *Bristor* only established the limited principle that groundwater may not be conveyed to a point beyond lands overlying the common supply, compelling the conclusion that if the water so transported returns at least in part to replenish the common supply, this satisfies the American doctrine of reasonable use. Appellee argues that while a party owning land overlying the common underground water supply could not convey pumped waters "off the land" or "off his land," this only meant land overlying the common source of supply. But there is no language in Bristor's complaint which suggests the water pumped by defendant Cheatham was not used on lands overlying the common supply.

The Bristors alleged in their complaint that defendant was transporting water three miles from where it was pumped, and in paragraph 14 of their complaint:

"that the water so pumped by defendant confers no benefit upon defendants' lands where the pumping operation is conducted; that such use by defendants is an unreasonable use as to plaintiffs \* \* \*."

The Court's holding, therefore, that the Bristors' cause of action stated sufficient facts to warrant relief, must be interpreted in light of the allegation that the water pumped conferred no benefit to the defendants' land on which the pumping was conducted.

From the context of the language used in the *Bristor* opinion, from the cases quoted in it, and from the Bristors' position as set forth in their complaint it is clear there is no firm basis for appellees' conclusion that the word "lands" meant other than lands on which the pumping occurred.

The allegation of FICO's complaint, Anamax's answer thereto, its answer to FICO's petition for an injunction and the allegations of Anamax's counterclaim all establish that the parties are in agreement that the water table within the Sahuarita-Continental Critical Groundwater Area of the Santa Cruz basin is being lowered and the reservoir of supply is being depleted. It is apparent, therefore, that the additional pumping proposed by Anamax from the well complained of in FICO's petition for injunction of April 15, 1974, will necessarily further deplete the source of supply of the existing users. Even if it be assumed that damage to FICO's wells has not yet taken place, still such damage must, inevitably, occur. FICO need not wait for its farms to be devastated before applying for injunctive relief against unlawful acts.

■ The appellees' theory that the American doctrine of reasonable use only forbids the conveyance of percolating groundwaters off the lands overlying the common source of supply is not supported by citation of any precedent. Neither is it an effective rule except possibly in those situations where there is an underground pool or basin of water. If we assume that the water withdrawn from an underground pool which is not consumptively used returns to replenish the common source of supply, still where groundwater percolates through the soil down gradient, the replenishment of the supply does not benefit the users of water up gradient from the point of return.

■ Moreover, the appellees' position flies in the face of the maxim "first in time, first in right." It contradicts this Court's holding that where large investments have been made in the development of groundwaters, the doctrine becomes a rule of property and the rights acquired under the Court's decisions and the investments made are entitled to protection. In the end, what appellees are asking this Court to do is to prefer the interests of mining over farming, irrespective of the time when rights were acquired and the then rule of law.

Finally, the principle for which appellees contend, namely, that they should be allowed to pump because they return water to the underground supply, is illusory. Admittedly, appellees consumptively use some of the water which they pump from the upper Santa Cruz basin. Since more water is being withdrawn than is being replaced, a court of equity is justified in interposing its protective cloak. Inevitably, sooner or later as the supply diminishes, appellant will be irreparably injured.

■ We hold the Superior Court's finding No. 2 of May 21, 1974 was error. Water may not be pumped from one parcel and transported to another just because both overlie the common source of supply if the plaintiff's lands or wells upon his lands thereby suffer injury or damage.

■ We have held that the State in case of shortage may constitutionally prefer existing users of water as against potential users. *Southwest Engineering Co. v. Ernst,* 79 Ariz. 403, 291 P.2d 764 (1955). Because of the State's policy expressed through the Legislature of preferring domestic and municipal users over irrigation and stock watering, we caused an injunction against the City of Tucson to be modified in order to permit it to withdraw water from the Avra-Altar Valleys within the Marana Critical Groundwater Area. *Jarvis v. State Land Department,* 106 Ariz. 506, 479 P.2d 169 (1970). Those cases are not, however, precedent for a doctrine that a court will prefer one economic interest over another on an ad hoc basis where there are not enough of the material goods of existence to go around. Rather, courts will protect rights acquired in good faith under previous pronouncements of the law. If it is to the State's interest to prefer mining over farming, then the Legislature is the appropriate body to designate when and under what circumstances such economic interest will prevail.

The order of the Superior Court of Pima County dated the 24th day of May, 1974, denying the application and amended application of Farmers Investment Company for preliminary injunctive relief is set aside with directions that the court proceed in a manner consistent with this opinion.

## THE APPEAL OF FARMERS INVESTMENT COMPANY AGAINST THE STATE LAND DEPARTMENT AND PIMA MINING COMPANY

FICO's appeal against the Pima Mining Company arises out of these facts.

On October 24, 1966, the State Land Commissioner executed State Land Department Commercial Lease No. 906 with Pima Mining Company as lessee. Pima Mining Company caused four water wells to be drilled on the leased lands so as to pump groundwater from the supply of the upper Santa Cruz basin and the Sahuarita-Continental Critical Groundwater Area. The

water so pumped was transported and used in connection with Pima Mining Company's mining and milling of copper ore at its plant located approximately four miles west of the lands the subject matter of Lease No. 906.

Both FICO and Pima Mining Company moved for summary judgments in the court below. FICO's motion was denied and Pima Mining Company's motion was granted. FICO petitioned this Court by special action to review the rulings of the Superior Court. We accepted jurisdiction for the limited purpose of determining the constitutional validity of State Lease No. 906. Our decision filed on June 19, 1974, 111 Ariz. 56, 523 P.2d 487, determined that the State Land Department violated the Arizona Constitution and Enabling Act and the lease was determined to be null and void.

The instant appeal from the summary judgment granted Pima Mining Company challenges only the sufficiency of the allegations of Count 4 of FICO's complaint to state a cause of action. FICO's allegation in Count 4 is that the continued pumping of water from the lands conveyed by the State Land Department's Lease No. 906 "constitutes a trespass upon plaintiff's property rights and a violation of the water law of the State of Arizona."

The question which is therefore presented is whether the pumping and transportation of groundwater from State lands lying within the upper Santa Cruz basin away from the lands on which the water is pumped is unlawful where the supply of other groundwater users who overlie the common source of supply is being lowered and depleted. It is immediately apparent from what we said in FICO's appeal against Anamax that it is.

FICO further questions whether the use of water pumped from the leased lands to transport tailings that are dumped on two sections of State school lands under a 10-year commercial lease with the State Land Department is a reasonable use of the water so pumped. In light of our conclusion that the pumping of water from the Santa Cruz basin is unlawful where it depletes the common source of supply of other landowners and damages their lands, we find it unnecessary to reach this question.

Since Pima Mining Company interposed certain affirmative defenses in the lower court in answer to Count 4 of FICO's amended complaint it is ordered that this matter be returned to the Superior Court of Pima County for further proceedings consistent with this decision.

## THE APPEAL OF THE CITY OF TUCSON AGAINST ANAMAX COPPER MINING COMPANY AND DUVAL CORPORATION

This appeal arises out of the intervention by the City of Tucson in the suit *Farmers Investment Company v. The Anaconda Company, et al.* The Anamax Copper Mining Company and the Duval Corporation filed counterclaims against Tucson and the lower court ordered summary judgments entered in their favor on their counterclaims.

Tucson's complaint in intervention asserted these facts. FICO is in possession of lands in the valley of the Santa Cruz River within the Sahuarita-Continental Critical Groundwater Area and its lands have been and are now irrigated by groundwater from wells. The Anaconda Company, the Duval Corporation, the American Smelting and Refining Company and the Pima Mining Company are corporations in possession of lands, which lands are used for the mining and milling of copper ores, located within the watershed of the Santa Cruz River but outside the Sahuarita-Continental Critical Groundwater Area. Tucson has during its existence as a city obtained most of its water from wells located within the watershed of the Santa Cruz River, some of which are now located within the Sahuarita-Continental Critical Groundwater Area. Much of the water used and distributed for municipal purposes by the City of Tucson is obtained from wells located in the valley of the Santa Cruz River and within its watershed

downstream from lands owned by FICO and the mining companies and downstream from the points at which FICO and the mining companies can return water to the underground water supply.

Tucson charged that the groundwater withdrawn by FICO and the mines is returned to the general groundwater system changed in quality by its use, so that ultimately the water which Tucson must draw from the Santa Cruz River valley will be rendered undesirable for domestic purposes. Tucson prayed that FICO and the mines be enjoined from returning or permitting to be returned to the groundwater system underlying the Santa Cruz River valley water of such quality as to render the general supply of groundwater undesirable for domestic purposes when the returned waters are mingled.

Tucson acknowledges that the water supply of the Sahuarita-Continental Subdivision of the Sahuarita-Continental Critical Groundwater Area of the Santa Cruz groundwater basin is limited and that the supply has been diminishing and the water table has been declining for many years. Tucson does not own lands which have historically been cultivated within the limits of the critical area.

The Anaconda Company in its counterclaim against Tucson asserted that it is the owner of an open pit copper mine operation; that it has been using and will continue to use the percolating waters of the Sahuarita-Continental Subdivision of the Santa Cruz groundwater basin; that the recharge of water to the groundwater basin is less than the amount of water that is being withdrawn from the basin; that it has been and will be irreparably injured and damaged by the withdrawal and transportation of the percolating groundwaters of the Sahuarita-Continental Subdivision of the Santa Cruz groundwater basin by Tucson for use by its municipal consumers.

The Duval Corporation and the Duval Sierrita Corporation in their counterclaims against Tucson alleged that they were the owners of land located within the Sahuarita-Continental Subdivision of the Santa Cruz groundwater basin; that the waters they pump are put to reasonable and beneficial use for industrial, mining and milling purposes on lands which they own in the Sahuarita-Continental Subdivision and that the supply of groundwater of such subdivision is limited; that for many years the water table has been lowering and the supply diminishing; that Tucson's pumping and transportation is unlawful and has caused and will continue to cause irreparable harm to them in that they will be deprived of the reasonable, beneficial and lawful use of such waters in said subdivision.

The Duval companies and Anaconda prayed for an injunction permanently enjoining Tucson from transporting any water from the Sahuarita-Continental Subdivision of the Santa Cruz groundwater basin. In the alternative, the Duval corporations asked for an order permanently enjoining Tucson from increasing the amount of water it transports from the subdivision.

The court below enjoined Tucson from pumping and transporting groundwater for use away from the Sahuarita-Continental Subdivision, Santa Cruz groundwater basin, in amounts exceeding the rate at which Tucson pumped before April 12, 1972. It further enjoined Tucson from using any wells and pumps installed in the subdivision after April 12, 1972, for the pumping of groundwater for use outside the subdivision. The court entered judgment in favor of The Anaconda Company and Amax Copper Mines, Inc. as partners in the Anamax Mining Company and the Duval Corporation and Duval Sierrita Corporation against the City of Tucson, finding that while material issues of fact existed out of which Tucson claimed the right to continue pumping groundwater from wells installed before the filing of Duval's counterclaim, any rights which could be established would not permit pumping of groundwater at rates in excess of those amounts pumped on or before April 12, 1972.

In *Jarvis v. State Land Department,* 104 Ariz. 527, 456 P.2d 385 (1969), in answer to the question whether Tucson could

pump water out of the Marana Critical Groundwater Area, we said:

"From the foregoing, it is readily apparent that any additional uses must necessarily deplete the source of supply of existing users. The City of Tucson in proposing to establish a system with a potential withdrawal capacity in excess of 30,000,000 gallons per day will be taking more than 30,000 acre feet per year. Hence, Tucson, if permitted to place its proposed system into use, would withdraw and transport from an area that is already critical an amount of water equal to about one-fourth of that presently being consumed with the resulting diminution and earlier depletion of the existing water supply. Tucson's action is clearly illegal." 104 Ariz. at 530, 456 P.2d at 388.

This case, like FICO's against Anaconda, is not predicated on the pumping of water from a critical groundwater area as were the two cases of *Jarvis v. State Land Department,* cited supra. In the *Jarvis* decision of 1969 we took judicial notice that the Avra and Altar Valleys were included within and were part of the Marana Critical Groundwater Area. We said:

"That these lands are within a Critical Ground Water Area is alone sufficient to grant petitioners the relief sought since a Critical Ground Water Area is a ground water basin or a subdivision thereof 'not having sufficient ground water to provide a reasonably safe supply for irrigation of the cultivated lands in the basin at the then current rates of withdrawal.' A.R.S. § 45–301. Manifestly, a ground water area or subdivision of a basin which does not have a reasonable safe supply for the existing users can only be but further impaired by the addition of other users or uses." 104 Ariz. at 530, 456 P.2d at 388.

In the instant case, the fact acknowledged by all parties is that the Santa Cruz basin does not have sufficient water to supply existing users. Consequently, the additional pumping of water by others will necessarily further deplete the source of supply.

This case is controlled by the American doctrine of reasonable use as construed in *Bristor v. Cheatham,* 75 Ariz. 227, 255 P. 2d 173, and *Jarvis v. State Land Department,* 106 Ariz. 506, 479 P.2d 169.

■ Tucson argues that if the doctrine of reasonable use means that the water must be used beneficially on the land from which it is taken, the mines are also guilty of unlawful conduct and have no standing in equity to enjoin the City's uses. But we agree with Duval that it has standing to enjoin the City's withdrawal since it owns 1,530 acres of land formerly cultivated inside the Sahuarita-Continental Critical Groundwater Area. Historically it is entitled to the use of water for irrigation. Duval has an interest in preserving the groundwater supply in the Santa Cruz basin.

The judgment of the lower court enjoining the City of Tucson from using any wells and pumps installed in the Sahuarita-Continental Subdivision after April 12, 1972 is affirmed.

HAYS, HOLOHAN and GORDON, JJ., concur.

CAMERON, Chief Justice, dissenting.

I regret that I must dissent. In doing so, I am aware that it is easier to take a contrary position in what is, at best, a hard and difficult case involving a body of law already burdened with many inconsistencies and uncertainties. I feel, however, that I cannot agree with the well-written opinion of the majority.

Before I discuss the main area of my disagreement, I wish to mention in passing two areas in which I feel a comment is indicated. First, I believe that as to the City of Tucson, the majority opinion is not only overly restrictive of the rights of the city, but fails to delineate what the City of Tucson must do if it is to obtain the water necessary to meet the minimum needs of its people. As the majority opinion is written, there is an inference that the City of Tucson may never be able to increase the amount of water they may take from the South Side Field no matter what they

do and how great the need. We have, in *Jarvis II* and *III*, allowed the city to take water from one basin to another under certain conditions, and I would allow the city to do likewise in the South Side Field.

Secondly, I feel that the time has come to consider again the doctrine of correlative rights under which the owners of land overlying a common supply of water are each limited to taking a proportionate share of the available water and which doctrine we rejected in *Bristor II* [*Bristor v. Cheatham*, 75 Ariz. 227, 255 P.2d 173 (1953)]. Under existing law, two adjacent landowners may pump each other dry to the detriment of themselves and others nearby. The result is all too frequently that the access to water is not based on "first in time, first in right" as stated in the majority opinion, rather access to water is determined by a race for consumption controlled not by reasonable use but the physical ability to extract water from the common supply. This encourages wasteful over-consumption and proclaims a right that cannot be protected. In other words, the larger and deeper the well, the more powerful the pump, the more likely it will be that a generous amount of water will be available for use upon the land serviced by that pump while the water underlying the neighbor's land is sucked down below the depth of his well. To the small or family farmer the right to water then becomes a cruel illusion, proclaimed by law, but unobtainable in practice.

However tempting it may be to discuss these two questions at length, I will confine myself primarily to a discussion of the meaning of "on the land" and "off the land" in the American doctrine of reasonable use which I belive the majority has, by implication, defined too narrowly.

Arizona has adopted the "reasonable use doctrine" with respect to percolating groundwaters. In reversing our holding in *Bristor v. Cheatham*, 73 Ariz. 228, 240 P. 2d 185 (1952) (*Bristor I*), to the effect that percolating groundwater is subject to appropriation, we stated:

"* * * the American rule [is] that one may extract such water for a reasonable, beneficial use of the land from which the same is taken. * * *" *Bristor v. Cheatham*, 75 Ariz. 227, 235, 255 P.2d 173, 178 (1953). (*Bristor II*).

Reasonable use has been defined not by the beneficial use of the water alone, but by the beneficial use of the water on the land from which the water was taken. Thus we stated in *Bristor II*, supra:

"A great majority of the states which in recent years have been presented with this problem adhere to the principle that the owner of lands overlying ground waters may freely, without liability to an adjoining user, use the same without limitation and without liability to another owner, providing his use thereof is for the purpose of reasonably putting the land from which the water is taken to a beneficial use. * * *" 75 Ariz. at 235, 255 P.2d at 178.

Water was then considered a part of the land from which it was taken and if it was put to beneficial use upon that land it was reasonable even if by doing so other adjacent landowners overlying the common supply were injured. Water could be taken off the land to alien land for other beneficial uses only if other landowners overlying the common supply were not injured thereby. In *Bristor II*, supra, we cited with approval:

"While there is some difference of opinion as to what should be regarded as a reasonable use of subterranean waters, the modern decisions are fairly harmonious in holding that a property owner may not concentrate such waters and convey them off his land if the springs or wells of another landowner are thereby damaged or impaired. * * *" *Rothrauff v. Sinking Spring Water Co.*, 339 Pa. 129, 134, 14 A.2d 87, 90 (1940).

And we reaffirmed this position in a more recent case:

"* * * Percolating waters may not be used off the lands from which they

are pumped if thereby others whose lands overlie the common supply are injured. (citations omitted).

"Such [i. e. percolating] waters can only be used in connection with the land from which they are taken. (citations omitted)" *Jarvis v. State Land Department (Jarvis II)*, 106 Ariz. 506, 508–509, 479 P.2d 169, 171–172 (1970).

It would thus appear from a series of Arizona cases that no matter now beneficial the use, percolating waters could not be used off the land if other landowners were thereby injured. Water was a part of the land and while it could be pumped from many feet underground to the surface, it had to be used on the land from which it was pumped. The corollary, of course, was that water could be severed from the land from which it was taken and transported to other land for reasonable and beneficial use at that new place so long as the owners of land overlying the common supply were not thereby injured:

"* * * It is the law of Arizona that percolating waters belong to the owner of the land on which they are found. (citations omitted) And he may convey them to other premises than those on which they are originally found, provided no other rights are injured thereby. (citation omitted)" *Fourzan v. Curtis*, 43 Ariz. 140, 147, 29 P.2d 722, 725 (1934). See also *Neal v. Hunt*, 112 Ariz. 307, 541 P.2d 559 (1975).

The strict limitation against taking groundwater off the land, if other landowners overlying the common supply are thereby injured, was considerably eroded by *Jarvis II*, supra.

In *Jarvis II*, supra, we allowed water to be taken from one groundwater area for use in another groundwater area even though it was assumed by the court that damage would result to the other landowners overlying the common supply. We stated:

"It is also frequently stated as a maxim of equity that equity follows the law. By this is meant that equity obeys and conforms to the law's general rules and policies whether the common law or statute law. (citation omitted) By A.R.S. § 45–147 the relative value of uses in appropriable waters has been fixed by the Legislature as first, domestic and municipal uses, and second, irrigation and stock watering. The creation of such a priority clearly evidences a legislative policy that the needs of agriculture give way to the needs of municipalities. Hence, we hold that the decree in this case will be modified if Tucson purchases or acquires the title to land within the Avra-Altar Valleys which are now cultivated and uses the water which would have been used in cultivating such lands as a source of supply for its municipal customers. Tucson may withdraw an amount equal to the annual historical maximum use upon the lands so acquired." *Jarvis v. State Land Department*, supra, 106 Ariz. at 510–511, 479 P.2d at 173–174.

And in *Jarvis v. State Land Department*, 113 Ariz. 230, 550 P.2d 227, filed 27 May 1976 (*Jarvis III*), this court further determined the amount that could be withdrawn by the City of Tucson.

There is, of course, no question that mining is a legal and proper use for water and can be a beneficial use. In the instant case, whether the mines could use the water in question depends upon whether their use is "on the land" or "off the land."

Logically, the land from which the water may be taken can be defined so as to be quite restrictive. For example, the actual field or pasture upon which the well is situated could be considered the land from which the water is taken and an adjacent pasture or field could be considered "off the land."

This appears to be the position taken by the majority when they state:

"The Court's holding, therefore, that the Bristors' cause of action stated sufficient facts to warrant relief must be interpreted in light of the allegation that the water pumped conferred no benefit to the defendants' land on which the pumping was conducted."

I believe that the "land from which the water was taken" is that land which overlies the judicially determined distinct body of groundwater from which the water was obtained. The rationale for this approach, which is, I believe, implicit in our previously published opinions, is, essentially, that damage to the available supply of groundwater occurs when water is permanently removed from the land overlying the common supply, so that it is prevented from returning through the ground to replenish the supply. There is no reason, according to the traditional legal understanding of groundwater hydrology, to prohibit the transporting of such water from one point to another, so long as both overlie the common supply. This is because the water is as available to replenish the common supply at the point of use as it would have been at the point of pumping. The transportation causes little diminution of the common supply, and no increase in damage to other landowners overlying the common supply. I believe that water used anywhere on land overlying the same common supply from which it was pumped is used "on the land" for the purposes of the reasonable use doctrine. I believe, then, that the finding of the trial court which read as follows:

"2. Water may be pumped from one parcel and transported to another parcel if both parcels overlie a common basin or supply and if the water is put to reasonable use. *Jarvis II.*"

should be upheld as representing not only the law as it existed before the majority opinion in this case, but common sense as well. I would affirm the decision of the trial court.

I feel that I must make one more comment concerning the majority opinion. The majority opinion, in an attempt to buttress its interpretation of the *Bristor* opinions, states:

"Appellee nonetheless argues that *Bristor* only established the limited principle that groundwater may not be conveyed to a point beyond lands overlying the common supply, compelling the conclusion that if the water so transported returns at least in part to replenish the common supply, this satisfies the American doctrine of reasonable use. Appellee argues that while a party owning land overlying the common underground water supply could not convey pumped waters 'off the land' or 'off his land,' this only meant land overlying the common source of supply. But there is no language in Bristor's complaint which suggests the water pumped by defendant Cheatham was not used on lands overlying the common supply.

"The Bristors allege in their complaint that defendant was transporting water three miles from where it was pumped, and in paragraph 14 of their complaint:

'that the water so pumped by defendant confers no benefit upon defendants' lands where the pumping operation is conducted; that such use by defendants is an unreasonable use as to plaintiffs * * *.'

"The Court's holding, therefore, that the Bristors' cause of action stated sufficient facts to warrant relief, must be interpreted in light of the allegation that the water pumped conferred no benefit to the defendants' land on which the pumping was conducted."

The bench and bar of this State have an obligation to follow the law as we state it in our written opinions. However, the pleadings in the trial court, which this court did not, at the time, consider important enough to quote in the opinion of the court, should not be considered as part of the case law of this State. I disagree with the majority's statement that the court's holding in *Bristor* must be "interpreted in light of the allegation" contained in Bristor's complaint. Bristor's complaint was not quoted in the opinions of this court in *Bristor I* and *II* nor was the complaint part of the record in the instant case. Our opinions should speak for themselves, and counsel should not be required to resort to ancient records and unpublished pleadings in interpreting our prior decisions.