**Clifton N. CHERRY, et al., Plaintiffs,**

v.

**Wesley E. STEINER, et al., Defendants.**

**No. CIV 81–719 PHX CAM.**

United States District Court,
D. Arizona.

July 19, 1982.

Mark Wilmer and Robert B. Hoffman, Snell & Wilmer, Phoenix, Ariz., for plaintiffs.

Kathleen Ferris, Chief Counsel, Dept. of Water Resources, James W. Johnson, Fennemore, Craig, vonAmmon & Udall, Phoenix, Ariz., for defendants.

## OPINION and ORDER

MUECKE, Chief Judge.

With their suit, plaintiffs seek a ruling that the 1980 Arizona Groundwater Code violates due process and equal protection in contravention of the fifth and fourteenth amendments to the United States Constitution. Their action prays for an order enjoining State officials from enforcing the statute and quieting title in their names to the groundwater underlying their properties.

The plaintiffs are several married couples, two corporations and a private water company, all of whom own land within the Upper Aqua Fria Subbasin of the Prescott Initial Active Management Area. They allege that there are substantial quantities of groundwater underlying their several properties, and that the legislation has diminished the value of the land by taking their ownership in the water without compensation. They further allege that the Code establishes arbitrary classifications which are not rationally related to the goals of the legislation, that the law contains impermissible irrebuttable presumptions, and that the legislation was passed in a manner which constitutes an impermissible delegation of legislative responsibility to an unauthorized third party.

The defendants are Wesley E. Steiner, Director of the Arizona Department of

Water Resources, who is charged with enforcement of the statute, and other public officials responsible for the filing of maps, which designate the groundwater management areas established by the legislation.

In response to the complaint, the defendants deny that the statutory scheme offends any constitutional provisions. They assert that the law is the result of a valid exercise of the State's police power. They specifically deny that the plaintiffs have any ownership interest, according to Arizona law, in percolating groundwater underlying their realty.

The lawsuit is a matter in controversy arising under the Constitution of the United States, conferring this Court with jurisdiction pursuant to 28 U.S.C. § 1331. This Court is also empowered to render a declaratory judgment, if appropriate, by the parties' invocation of 28 U.S.C. § 2201.

For the reasons set forth below, the Court finds and concludes that there are no material facts in dispute, and that the legislation is a permissible exercise of the State's police power and does not offend the Constitution. Accordingly, the defendants' Motion for Summary Judgment is granted, while the plaintiffs' Motion for Summary Judgment is denied.

*Groundwater in Arizona*

During the 1930's, the shortage of groundwater in the State became a matter of concern. It was not until 1948 though, that legislation was passed dealing with the problem. The Groundwater Code of 1948 was promulgated under threat from the United States Department of Interior that the Central Arizona Project would not be built unless Arizona took steps to regulate its groundwater. At the time, the Code was viewed as a temporary measure. Nevertheless, with minor changes it remained the law until the 1980 law was enacted.

The Code of 1948 authorized the State Land Commission to designate "critical groundwater areas," within which there would be no further expansion of agricultural irrigation with groundwater. Existing agricultural wells were permitted to continue pumping.

The constitutionality of the Code was upheld in *Southwest Engineering Co. v. Ernst,* 79 Ariz. 403, 291 P.2d 764 (1955). In so doing, the Arizona Supreme Court rejected allegations similar to the ones that have been raised in this suit—that the 1948 Code took property without compensation, was violative of equal protection and was an unauthorized delegation of legislative responsibilities.

Previously, in a rehearing of a decision which held that all groundwater was subject to prior appropriation, the Arizona Court had reinstituted the common law rule, in holding that a landowner had the right to the reasonable use of the groundwater underlying his property. *Bristor v. Cheatham,* (*Bristor II*), 75 Ariz. 227, 255 P.2d 173 (1953).

The temporary nature of the 1948 Code was underscored in the *Jarvis* trilogy, which attempted mediation, among special interests for the State's finite bank of groundwater. In *Jarvis v. State Land Department* (*Jarvis I*), 104 Ariz. 527, 456 P.2d 385 (1969), the City of Tucson was enjoined from transporting water to the city for municipal use from wells in a critical groundwater area. The injunction was modified in *Jarvis II*, 106 Ariz. 506, 479 P.2d 169 (1970), so as to allow the city to purchase land within the critical groundwater area, retire the land from cultivation and irrigation, and transport groundwater from the farmlands to the municipal service area in an "amount equal to the annual historical maximum use upon the lands so acquired." 106 Ariz. at 511, 479 P.2d at 174.

*Jarvis II* exemplified the flexibility in the reasonable use doctrine by permitting the transportation of groundwater off of the land from which it is pumped for beneficial use elsewhere. In *Jarvis III*, 113 Ariz. 230, 233, 550 P.2d 227, 230 (1976), the Court interpreted "annual historical maximum use" to mean "consumptive use," reducing the amount available to the City of Tucson by approximately 50 percent.

The transportation of mined groundwater was again addressed in *Farmers Investment*

*Co. v. Bettwy*, 113 Ariz. 520, 558 P.2d 14 (1976). The court held that the doctrine of reasonable use prevented the transportation of water away from "the land from which the groundwater is being pumped," where the supply of other groundwater users who overlie the common source of supply is being lowered and depleted. Recognizing the potential economic impact of such a decision, the opinion stated that the courts would not prefer one economic interest over another, but that "the Legislature is the appropriate body to designate when and under what circumstances such economic interest will prevail." *Id.*, 113 Ariz. at 527, 558 P.2d at 21.

In its next session, the Arizona Legislature passed a bill which provided that one could file an application for a Certificate of Exemption for the amounts of groundwater then being used by that person or entity. These 1977 amendments to the Groundwater Code of 1948 further provided that once an exemption was obtained, the transporter could transport as much water off the property as was originally being used thereon, without the threat of injunction. The transporter could be sued for damages, however, if it damaged other landowners who owned land over the same groundwater basin or aquifer.

The 1977 amendments were challenged on the grounds that such a scheme constituted the taking of property without just compensation and that restriction of the remedy available violated the principle of separation of powers. These arguments were rejected and the constitutionality of the legislation was upheld in *Town of Chino Valley v. State Land Department*, (*Chino Valley I*), 119 Ariz. 243, 580 P.2d 704 (1978).

The 1977 amendments recognized the necessity of a comprehensive overhaul of the Groundwater Code. To this end, the legislation established the Groundwater Management Study Commission and provided that this Commission would draft a recommendation which would become the State's Groundwater Code unless the legislature passed its own bill before the end of 1981.

The legislature recognized that no major legislation could be passed over the objection of any major class of water users. Consequently, the Study Commission was made up of representatives of the major types of water users: agricultural, mining, urban and Indian interests. The Commission held public hearings and workshops, and solicited input through mailings.

The Commission developed a Draft Report, which provided a proposal for comprehensive groundwater management. The two agricultural representatives on the Commission dissented.

In light of the dissents and the objections of irrigators at the public hearings, the Commission decided to make further revisions in hopes of bringing agriculture into the group supporting the bill. Negotiations with agricultural interests were conducted, resulting in the production of "Concepts for Agreement Integrated Package." The Commission accepted the Concepts package and, without dissent, directed the package be put into statutory language.

On June 5 and 6, 1980, the Commission and both houses of the legislature held public hearings on the bill. On the 6th, the Commission recommended the amended draft to the legislature by a vote of 19 ayes, 1 no, and 4 abstentions. On June 9, hearings were held by committees of the joint legislature. The bill was passed by the legislature in special session on June 11, and signed into law by the Governor the next day.

### The Groundwater Code of 1980

The Code commences by recognizing that the people of Arizona are very dependent on groundwater as a source of their water supply. Also acknowledged are the facts that the withdrawal of groundwater is and has been in great excess of the safe annual yield and that this threatens the State's welfare. A.R.S. § 45–401. (All subsequent references to A.R.S. sections will list only the section number).

In response, the Code announces its intentions as seeking to conserve, protect and allocate groundwater and provide a framework for management and regulation of the

withdrawal, transportation, use, conservation and conveyance of rights to use the groundwater. § 45–401 B

One of the principal features of the legislation is the establishment of Active Management Areas (AMA), § 45–402(2), which are geographic areas where groundwater supplies are imperiled. In these areas, groundwater use is subject to close scrutiny and intensified regulation. An AMA encompasses a relatively distinct hydrological body or related body of water, termed a groundwater basin or sub-basin. § 45–412(B).

The Code established four initial AMA's: Tuscon, Phoenix, Prescott, and Pinal. § 45–411(A). The plaintiffs in this suit are landowners within the Prescott AMA, which includes the Little Chino and Upper Agua Fria Subbasins. Plaintiffs correctly assert that there are no administrative means for modifying the boundaries of the initial AMA's. This was legislatively accomplished and can be modified only by the legislature.

The Groundwater Code also provides for the future classification of additional AMA's. § 45–412. A subsequent AMA could be established only after hearings were held, and any such decision would be judicially reviewable.

An elaborate system of management of groundwater in the AMA's is established. Uses of groundwater in the areas are permitted to continue and are called "grandfathered rights." There are three categories of grandfathered rights: irrigation rights, § 45–465, Type 1 non-irrigation rights, § 45–463, and Type 2 non-irrigation rights, § 45–464. An irrigation right is measured in acres of land which may continue to be irrigated and is determined by historical use. Holders of irrigation rights are encouraged to convert their land to non-irrigation uses. § 45–472. The right to use groundwater for a non-irrigation purpose by virtue of having retired irrigated land is a Type 1 non-irrigation right. § 45–463.

Type 2 non-irrigation rights are all remaining non-irrigation uses of groundwater in existence when an AMA is designated, e.g., mines, and industry. Withdrawal from domestic wells and withdrawals by cities, towns and private water companies from outside their service areas or within their service areas pursuant to a certificate of exemption is considered to be within Type 2 uses. § 45–464(C).

Service areas are those areas being served water by a public or private water company. § 45–402(25). Municipalities and water companies may withdraw enough water within their service areas to serve their customers, although they are restricted from extending their service areas and the types of services that they provide. § 45–493(A) & (B).

The Code also established two irrigation non-expansion areas, which are not subject to active management, but in which new land may not be irrigated. These areas have been determined to be capable of supporting existing irrigation uses at current rates of withdrawal, but could not safely support expanded withdrawals. § 45–431.

Within AMA's, the Code generally prohibits new uses of groundwater. § 45–491, et seq. While new withdrawals for domestic uses are permitted, § 45–492, no additional industrial uses will be allowed, except where designed to require maximum conservation, § 45–497. Industrial users will be required to purchase and retire irrigated lands if available. Id. Further, there is a prohibition against putting new land into irrigation with any kind of water. § 45–493(C).

Recognizing that grandfathered rights or the purchases from water companies within service areas may not provide sufficient water, a system for obtaining permits to withdraw additional quantities of water has been established. § 45–512—19. The permits may be issued only for limited purposes and after certain requisites have been satisfied.

The Code contains strong management tools. Subdivided lands within an AMA may be sold only after the developer has demonstrated that there is sufficient water to satisfy the needs in the subdivision for

the next 100 years. § 45–576. In addition, a subdivider must show that the projected water use is consistent with the management plans for the AMA, which have been established by the Director of the Department of Water. *Id.* The assurance of a supply of water need be demonstrated despite the fact that the subdivision will be served by a water company, although if the subdivision is to receive Central Arizona Project water, the director may deem the water assurance requirement met. § 45–576(E).

The problem of transportation of groundwater has also been addressed by the legislation. In *Farmers Investments,* 113 Ariz. 520, 558 P.2d 14 (1976), the Arizona Supreme Court held that the City of Tucson and Anamax Mining Company could be enjoined from withdrawing groundwater from lands that they owned and transporting the water to land other than from which the waters are taken. However, the Code permits such transportation of amounts of water equal to the historical use. The new law does recognize the reasonable use doctrine and provides that if such mining and transportation does lower the water table so as to diminish the water available to another landowner whose land overlies the common watertable, the transporter is subject to damages. § 45–544(2). While transportation of groundwater is regulated from areas both within and without AMAs, transportation from within AMA's is regulated more strictly and depends upon the use for which the water is intended and the type of water rights possessed by the party withdrawing the groundwater. §§ 45–541—44.

Chapter 1 of the groundwater legislation creates the Department of Water Resources, § 45–102, within which is the Arizona Water Commission. § 45–121. The director of the department succeeds to the power previously held by the Groundwater Commission. Presently, the director is Wesley Steiner, a defendant in this suit. The director is required to promulgate and implement groundwater management plans.

The Code provides for five management periods: four, ten-year periods and one, five-year period. §§ 45–564—68. The director is to develop a plan for each AMA for each period. In successive periods, the conservation requirements become progressively more stringent. Throughout the course of the management program, groundwater use is to be curtailed through the imposition of irrigation water duties, § 45–402, and increased conservation by cities and industry. § 45–564—68.

Management programs in the future provide for augmentation of water in each AMA and the imposition of withdrawal fees on users. *Id.* Further, the State will be allotted funds for the purchase and retirement of grandfathered irrigation rights and will exercise control over the location or redrilling of wells. *Id.*

In summary, probably the biggest innovation in the Code is the establishment of AMA's. Previous water uses are permitted to continue, although through a series of controls and regulation, increased use is prohibited, and users are encouraged to convert land to uses less dependent on groundwater. Transportation of groundwater and alienation of water rights are dealt with in a manner that also encourages conservation and putting groundwater to its most efficient use. The Code creates a state agency charged with the management of groundwater in Arizona.

*The Cross-Motions for Summary Judgment*

The parties have filed Cross-Motions for Summary Judgment. They allege, and the Court agrees, that there are no issues of disputed fact. Plaintiffs seek a determination that the Code is unconstitutional on the grounds that the legislation constitutes a taking of property without just compensation, that it contains impermissible irrebuttable presumptions, that its classifications violate the equal protection clause, and that the Code makes an impermissible delegation of legislative power to an unrestrained third party. Plaintiffs further seek an order quieting title in the groundwater underlying their properties.

With their motion, the defendants seek a ruling that the legislation is constitutional and was a valid exercise of the State's police powers.

## DUE PROCESS TAKING

The principal argument advanced by the plaintiffs is that the Code takes their property without due process of law. This argument is premised upon the assumption that a landowner owns the groundwater that underlies his property. Plaintiffs argue that the imposition of any conditions upon their use and enjoyment of their groundwater by state action is constitutionally infirm.

■ The death knell for this argument sounded after this suit was filed, when the Arizona Supreme Court announced its decision in *Town of Chino Valley v. City of Prescott*, 131 Ariz. 78, 638 P.2d 1324 (1981), *appeal dismissed*, —— U.S. ——, 102 S.Ct. 2897, 73 L.Ed.2d 1310 (1982). That case, *Chino Valley II*, raised essentially the same issues that have been presented to this Court. Most importantly, the decision explicitly held that there is no right of ownership in groundwater prior to its capture. A landowner whose land overlies groundwater has only the right to use of the water, but maintains no proprietary interest in the actual water. 131 Ariz. at 82, 638 P.2d at 1328.

■ Federal courts look to state law for the definition of property rights. 28 U.S.C. § 1652. Additionally, a federal tribunal, when interpreting state law is bound by the interpretation of the law by that state's courts. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Arizona Supreme Court has stated that there is no propriety interest in percolating groundwater. That court has further declared that any language in previous decisions, which suggested that there was a property interest in groundwater, was only dicta. 131 Ariz. at 81, 638 P.2d at 1327.

■ The only interpretation of Arizona law open to this Court is that a landowner has no interest in underlying groundwater prior to its capture. Without an interest in the percolating water, the plaintiffs may not assert a wrongful taking of their property; *Chino Valley II* emasculates their due process argument.

The plaintiffs have attempted to circumvent the impact of *Chino Valley II* by alleging that the Supreme Court's decision, itself, has unconstitutionally destroyed property rights. They rely on some old case law for the proposition that when a court decision works an unpredictable change in state law, this gives rise to a federal question as to whether the court has impermissibly taken property without due process. *Chicago B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1896); *Pease v. Peck*, 59 U.S. (18 How.) 595, 15 L.Ed. 518 (1855).

Plaintiffs allege that previous Arizona decisions have established a landowner's proprietary interest in the groundwater underlying the property *e.g., Howard v. Perrin*, 8 Ariz. 347, 76 P.2d 460 (1904), *aff'd* 200 U.S. 71, 26 S.Ct. 195, 50 L.Ed. 374 (1906). They argue that the *Chino Valley II* decision was a radical departure from prior law and thus does violence to their property rights.

This argument must fail for several reasons. Initially, the status of the law in Arizona regarding groundwater as private property was not as clear as the plaintiffs would have this Court believe. In *Southwest Engineering Company v. Ernst*, 79 Ariz. 403, 291 P.2d 764 (1955), the Arizona Supreme Court analyzed its prior decisions dealing with groundwater, including *Southwest Cotton, supra*, and *Bristor II, supra*, cases upon which the plaintiffs base their contentions of proprietary rights in groundwater. The *Ernst* court found that while prior decisions may have decided that landowners had an interest in water underlying their property, that those cases dealt only with disputes between individuals and that "the question was left open as to the right of the state against individuals to regulate the consumption of water in the interest of the general welfare. 79 Ariz. at 408, 291 P.2d at 767. Recognizing the weighty public concern over the depletion of groundwa-

ter sources, the *Ernst* court concluded by stating: "we cannot say that the exercise of such choice, controlled by considerations of social policy which are not unreasonable, involves a denial of due process." 79 Ariz. at 410, 291 P.2d at 769. In rendering its decision, the Court in *Ernst* rejected a due process taking argument similar to this one.

Besides recognizing that the future use of groundwater was a matter of legislative concern, the decisions upon which the plaintiff rests are not as unequivocal as plaintiffs' protests. One of the state's preeminent authorities on water law has stated this about the *Bristor II* decision,

> Bristor did not accept the doctrine of 'absolute ownership,' and appropriation theory was expressly rejected by the court on rehearing. The court distinguished correlative rights doctrine and put it aside in favor of 'reasonable use' doctrine, which in operational terms includes exercise of the state's police power . . . . Clark, R.E., *Groundwater Management: Law and Local Response*, 6 Ariz.L. Rev. 178, 197 (1964–65).

In the *Bristor II* decision, the Court also recognizes that the overlying owner's right is to the *use* of the water, not the water itself. 75 Ariz. at 234, 255 P.2d at 180.

Not only is the plaintiffs' reliance upon selected passages of Arizona case law misplaced, the plaintiffs, in asserting an absolute right to ownership of groundwater, ignore the actions of legislatures and courts throughout the country. Water, particularly in the West, is becoming increasingly in demand and valuable. Recognizing the potential public shortages of water, legislatures, through the use of their police power, have passed legislation restricting private use. This Court is unaware of any such police power actions which have been found unconstitutional.[1]

Finally, the plaintiffs' assertions of ownership of percolating groundwaters must fail on the basis of logic. Groundwater is "water under the surface of the Earth regardless of the geological structure in which it is standing or moving. It does not include water flowing in underground streams with ascertainable beds and banks." § 45–101(4). Groundwater knows no boundaries and may flow under the land of several landowners. It would be impossible to accord to each overlying landowner the right to the underlying, percolating water, as withdrawal by one owner necessarily interferes with the enjoyment of the like privilege of other owners.

Plaintiffs' claims of an unconstitutional taking of their property is based upon a misreading of Arizona law. Furthermore, the claim ignores the experience of other states and is logically unsound. The State has the power, within constitutional limitation, to impose such restraints upon private rights as are necessary for the common good.

IRREBUTTABLE PRESUMPTION

The plaintiffs also argue that the legislation establishes irrebuttable presumptions in its categorization of Active Management Areas (AMA's) and is thus violative of due process. They note that the legislation contains no explanation as to why the four AMA's were so designated. They point out that in order to designate a subsequent AMA, the State would need to make certain findings and hold hearings. Plaintiffs reason that because the legislation contains no findings in regard to the initial AMA's, that this denomination constitutes an irrebuttable presumption.

While it is true that the new statute itself is silent as to the basis for the AMA designations, the legislative history is full of support for this legislative categorization. Initially, it need be noted that the four initial AMA's account for 69 percent of the total groundwater overdraft in the state and include 80 percent of the State's

---

1. *See Crookston Cattle Co. v. Minnesota Department of Natural Resources*, 300 N.W.2d 769, 774 (Minn.1980); *Village of Tequesta v. Jupiter Inlet Corp.*, 371 So.2d 663, 670 (Fla. 1979), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 377 (1979); *Baeth v. Hoisveen*, 157 N.W.2d 728, 732 (N.D.1968); *Williams v. City of Wichita*, 190 Kan. 317, 374 P.2d 578 (1962), *appeal dismissed*, 375 U.S. 7, 84 S.Ct. 46, 11 L.Ed.2d 38 (1963).

population. Looking toward the future, the State expects its largest population increases within these areas.

■ Despite such solid factual footing, the Code cannot be threatened by an irrebuttable presumption argument, as this doctrine is probably no longer viable in this circuit, *deLaurier v. San Diego Unified School District*, 588 F.2d 674, 683, n. 16 (9th Cir. 1978). Additionally, the doctrine never applied to legislative decisions regulating the private sector of the economy. *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Mourning v. Family Publication Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

Although plaintiffs argue irrebuttable presumption, their lack of a reply to the defendants' reference to these cases seems to recognize the inevitable failure of such position.

## DELEGATION OF LEGISLATIVE AUTHORITY

■ It is next alleged that the legislature abdicated its non-delegatable responsibility, when it enacted legislation which incorporated maps of the four initial AMA's, which had not yet even been prepared. Plaintiffs argue that the legislature and the Governor could not have had any idea of what they were enacting if they did not have these maps before them at the time of their respective acts. Further, plaintiffs contend that it is an impermissible delegation of the legislative responsibility to permit an unauthorized third party, the State Water Commission, to prepare such a critical part of the legislation.

The defendants respond by avowing that the legislature and the Governor were working from smaller, more compact maps, with the identical boundaries as set forth on the maps later filed with the Secretary of State.

■ Regardless of the situation, such inquiry by a court is prohibited by the Enrolled Bill Doctrine. This policy precludes judicial inquiry from going behind the legislation to examine the circumstances under which it was passed. *See e.g., Field v.*

*Clark*, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892). Arizona courts have also recognized that the separation of powers doctrine, and the respect the judiciary should give to the enactments of a coordinate branch of government, prevent them from examining alleged procedural defects or irregularities in the passage of legislation. *Hernandez v. Frohmiller*, 68 Ariz. 242, 204 P.2d 854 (1949).

The Enrolled Bill policy prevents this Court from inquiring into the manner in which the Code was enacted.

## DUE PROCESS AND EQUAL PROTECTION

Plaintiffs have alleged that a variety of provisions of the Code are arbitrary and not rationally related to legitimate legislative goals, rendering the legislation violative of the equal protection and due process clauses.

■ Legislative acts adjusting the burdens and benefits of economic life come to the courts with a presumption of constitutionality. *Hodel v. Indiana*, 452 U.S. 314, 323, 101 S.Ct. 2376, 2382, 69 L.Ed.2d 4 (1981). Plaintiffs have the burden of overcoming this burden. They must establish that the legislature's classifications are purely arbitrary and not rationally related to a legitimate legislative purpose. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

The plaintiff's attack on the Code is broad-based. They argue that the classification of certain areas as AMA's is discriminatory, that the boundaries for these areas are not rationally justifiable, and that the distinctions drawn between different types of water users is irrational. Plaintiffs contend that there is no justification for distinction between private and public water companies, or between mining and other industrial use permits. They allege that the implementation of irrigation water duties will discriminatorily impact upon them.

■ It is not this Court's task to weigh the wisdom of the legislature's work. Whether a more attractive alternative ex-

ists is not of concern, but only whether there exists a rational basis for the Code's provisions. For each and every suggestion of constitutional infirmity made by the plaintiff, the defense has provided a rational explanation for that provision.

The designation of Active Management Areas was based upon the recommendation of the Arizona water commission that these areas required active management so as to meet a goal of safe-yield. The commission held public hearings and solicited public input through mailings. It considered the works and opinions of experts in the fields of demography and hydrology. It established four AMA's which account for 69 percent of the State's groundwater overdraft and 80 percent of the State's population. The three AMA's with safe yield goals account for 45 percent of the overdraft and 77 percent of the population in Arizona. The Arizona Department of Economic Security has forecasted that the State's population will explode most profoundly in the area encompassed by the Phoenix, Tucson and Prescott AMA's.

Pursuant to the 1948 Groundwater Code, ten Critical Groundwater Areas were designated. Every previously designated Critical Groundwater Area was included in either an AMA or an Irrigation Non-Expansion Area under the new Act. The Arizona Supreme Court found that the establishment of Critical Groundwater Areas was constitutional in *Southwest Engineering Co. v. Ernst,* 79 Ariz. 403, 412, 291 P.2d 764, 770 (1955), under a similar constitutional analysis.

[12] The defendants have documented the existence of a sound hydrological basis for the boundaries which establish AMA's. In any case, the equal protection clause does not apply to the differing treatment accorded geographical areas. *McGowan v. Maryland,* 366 U.S. 420, 427, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

■ The plaintiffs claim that the distinctions made between the types of water users is discriminatory. A statute is not invalid because it draws distinctions between classes and treats those classes differently, so long as the distinctions are based upon legitimate differences between the classes and bear a reasonable relationship to the purpose of the legislation.

According to depletion or consumptive use rates, irrigation consumes 89 percent of the total water in the state. The increasing competition between farming, mining and urban uses for groundwater was recognized in the *Jarvis* trilogy. Arizona courts have long recognized that reconciling these competing uses was a task for the legislature. *Ernst,* 79 Ariz. at 411, 291 P.2d at 770. Water users have long been on notice that the State would at some point have to intervene to regulate prospective uses of a dwindling resource in the face of increased use. The Code does so in a structured, principal manner with the state's general welfare as its talisman.

■ The plaintiffs have claimed that the Code in several places prefers municipal water companies over private companies and is therefore violative of equal protection. Courts have upheld the differentiation between private and public utilities where such distinction is justified by the aims of the legislation. *Springfield Gas and Electric Co. v. City of Springfield,* 257 U.S. 66, 42 S.Ct. 24, 66 L.Ed. 131 (1921); *Southern California Edison Co. v. United States,* 415 F.2d 758, *cert. denied,* 396 U.S. 957, 90 S.Ct. 427, 24 L.Ed.2d 420 (9th Cir. 1969).

The distinctions in the Code are clearly justified. Private companies are frequently formed by subdividers to provide services for their developments. In some instances, they are under-financed, and generally, the motives of the developer are not so much publicly oriented as they are to assist in the sale of lots in the subdivision. Public companies frequently are forced to later take over private companies. Further, private companies are far more constrained than public companies in the raising of revenues through bonds.

One of the primary goals of the Code is to prohibit urban development in areas where adequate water supplies do not exist. Pub-

lic companies are more able to plan for the future than their private counterparts. They have a sounder economic base and a legal obligation to plan for and assure adequate water supplies. Any distinctions made between these entities by the Code are completely rational and therefore justified.

Also heard, is the complaint that mining receives a different treatment from other industrial water users in the obtaining of use permits. Defendants point out that unlike most other water users, mining companies do not have any flexibility in where they locate; they mine where the ore is available. Furthermore, mining accounts for only 2.7 percent of the total groundwater pumping in the State, while making a very significant contribution to the economy. Finally, the mining industry's use of water is the least intensive per acre of land of any economic enterprise in the State outside of stock grazing. The defendants properly point out that any distinctions conferred on the mining industry in its obtaining use permits is certainly justified by the unique position it occupies.

The quantity of water which may be used by irrigators will be limited by irrigation water duties to be set by the Director of the Department of Water Resources. These determinations are to be made upon an analysis of each individual farm unit. § 45–402.-10. Such an analysis may take into account the unique situation of each tract of land and is to be based upon historical use. Irrigators, unlike other water users, have the availability of variances, flexibility accounts and credits, to mitigate hardships that water duties may occasion. Additionally, irrigators are the only group of water users for whom conservation is not mandatory.

Plaintiffs, however, have argued that the system of water permits is discriminatory. This argument, like their others, must fail. The *Ernst* case established that the legislature could validly prohibit the irrigation of new land. Presently, the irrigation of crops in the State consumes more than the entire dependable water supply of the State. The legislature, therefore, has a valid basis, indeed responsibility, for limiting the development of land for new irrigation.

The State has not prohibited existing uses. Instead, it has provided that all existing irrigation may continue subject only to the imposition of use duties designed to promote reasonable groundwater conservation. The state has designed a rational method of attaining a legitimate governmental goal. The Code is not constitutionally discriminatory.

MOTION TO STRIKE

Plaintiffs have submitted a Motion to Strike many of the affidavits and exhibits that the defendants have introduced in support of their Cross-Motion for Summary Judgment. They allege that many of the documents are irrelevant or immaterial, that they have not been authenticated or that the materials were never considered by the legislature. Plaintiffs also allege that some of the affidavits should be stricken in that they are not made on the basis of personal knowledge. Finally, they present an estoppel argument, contending that because they voluntarily withdrew a notice of deposition in the face of a defense motion for protective order, that none of the information sought from the deponent should be permitted to be introduced.

During the discovery stages of this case, plaintiffs noticed the deposition of Kathleen Ferris, Chief Counsel for the Department of Water Resources and past Executive Director of the Groundwater Management Study Commission. The defendants filed a Motion for Protective Order, stating that Ferris was a member of the defense counsel team in this lawsuit, that some of the anticipated questioning was protected by the attorney-client privilege, and that the information sought by the plaintiffs was irrelevant under the Enrolled Bill Doctrine. Upon receipt of the Motion for Protective Order, plaintiffs voluntarily withdrew their notice of deposition, without the Court ever acting.

Plaintiffs now argue that defendants should not be permitted to introduce evidence that they earlier argued was irrelevant under the Enrolled Bill Doctrine.

**1282**

They contend that the consideration of such evidence would offend notions of estoppel.

Initially, it must be remembered that the Court was never forced to face the request for protective order. Plaintiffs voluntarily abandoned their intent to depose Ferris, thereby mooting the Motion for Protective Order. The Court knows of no doctrine that prohibits a party from arguing in the alternative at various stages of the litigation. There certainly was no law of the case established previously.

Furthermore, it would be ridiculous to allow plaintiffs to put the rationality of the legislation of the Code in question, and then tie the hands of the defendants behind their backs by prohibiting them from presenting a case for its rational basis. The Motion to Strike on the basis of estoppel is denied.

■ Parts of the documentation by the defendant was introduced in response to the plaintiffs' argument that there was an impermissible delegation of legislative authority in the preparation, passage and signing of the legislation. Although defendants have posited that such an inquiry is barred by the Enrolled Bill Doctrine, they have presented evidence for the purpose of showing that the Code followed proper legislative channels in its preparation and adoption. The Court has agreed that judicial inquiry into the legislative process is impermissible. Consequently, none of the materials presented by the defendants in this regard have been considered. The plaintiff's Motion to Strike is, therefore, granted to the extent that it sought exclusion of materials which go behind the bill to show that the legislation was properly drafted and passed.

■ The other materials in support of the defendants' Motion for Summary Judgment may properly be considered. The plaintiffs have opened the door regarding whether there existed a rational basis for the Groundwater Code. The defendants have responded with the materials on which the legislation is based. The fact that the legislature did not consider each page of the studies and reports is not grounds for holding such information inadmissible. The materials are relevant and material. The foundation objections are so vague as to not constitute proper objections. The authentications objections are legally frivolous. The Motion to Strike on these grounds is denied.

Based upon the foregoing discussion of the facts and law,

IT IS ORDERED that the defendants' Cross-Motion for Summary Judgment is granted, while the plaintiffs' Cross-Motion for Summary Judgment is denied.

IT IS FURTHER AND FINALLY ORDERED that the plaintiffs' Motion to Strike is granted in part and denied in part.