276 N.J. Super. 52 (1994)
647 A.2d 182
UMC/STAMFORD, INC., ET AL., PLAINTIFFS,
v.
ALLIANZ UNDERWRITERS INSURANCE COMPANY, HOME INSURANCE COMPANY, HARTFORD ACCIDENT & INDEMNITY COMPANY, FIRST STATE INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, REPUBLIC INSURANCE COMPANY, SECURITY INSURANCE COMPANY OF HARTFORD, LONDON MARKET INSURERS, OLD REPUBLIC INSURANCE COMPANY, UTICA MUTUAL INSURANCE COMPANY, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided March 16, 1994.
*55 Michael Dore, Arthur H. Saiewitz & Rosemary E. Ramsay, for plaintiffs (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys)
Nina Lynn Caroselli, for defendant Home Insurance Company (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys)
Robert F. Walsh, for defendants Hartford Accident & Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company (Siff Rosen, P.C., attorneys)
Bruce A. Tritsch, for defendant Allstate Insurance Company, formerly Northbrook Insurance Company (Feinberg and Tritsch, attorneys); Vincent S. Ziccolella, for defendant Allstate Insurance Company (Gleason, McGuire & Shreffler, attorneys)
Elizabeth M. DeCristofaro, for defendant Continental Casualty Company (Ford, Marrin, Esposito, Witmeyer & Gleser, attorneys)
Marian S. Hertz, for defendant Republic Insurance Company (Sheft & Sheft, attorneys)
Richard S. Mannella, for defendant Security Insurance Company of Hartford, individually, and as successor by merger to United States Casualty Company (Manta and Welge, attorneys)
Diane Di Franco, for defendant London Market Insurers (Mendes & Mount, attorneys)
Jeffrey A. Walder, for defendant Old Republic Insurance Company (Walder, Sondak, Berkeley & Brogan, attorneys)
Joseph L. Ruby, for defendant Utica Mutual Insurance Company (Wiley, Rein & Fielding, attorneys)
FUENTES, JULIO M., J.S.C.
This opinion summarizes a number of pretrial rulings made in this environmental insurance coverage case. Plaintiffs, *56 UMC/Stamford, Inc., UniDynamics Corporation, et al. (UMC) seek judgment against various insurance companies declaring that they must provide coverage under certain multiple policies of insurance, including certain excess policies for claims against plaintiff which arise out of environmental pollution at particular sites located in several states around the country. This decision relates to two of those sites: Roseland, New Jersey, and Salinas, California.
The facts are not largely disputed. In 1978 UMC acquired Resistoflex Corporation, a specialty-pipe manufacturer which operated a facility in Roseland from 1956 until 1987. The pipes manufactured at the facility were used primarily in the aerospace and petrochemical industries.
As part of its operations, Resistoflex used a solvent known as trichlorethylene ("TCE") to clean and degrease parts and prepare them for painting. Resistoflex believes that through a variety of sources, including accidental spills, drum leaks and unauthorized disposal practices by employees, TCE was introduced into a landfill on the property which had served as the septic system for the facility. In May 1984, the New Jersey Department of Environmental Protection and Energy ("DEPE") discovered the presence of TCE in the soil and groundwater at the facility. Thereafter, in July 1988 the DEPE issued a directive determining, in part, that "[Resistoflex] is responsible for the discharge of hazardous substances into the aquifer from which Essex Fells Water Department obtains its water supply."
With regard to the California site, plaintiff operated an ordnance and electromechanical device manufacturing facility at Salinas from 1957 to 1973. As was the practice in Roseland, TCE solvents were used to clean and degrease parts. The spent solvents which were used to control weed growth evaporated into the soil and seeped into the groundwater. In 1989, local officials ordered plaintiff to remediate the contaminated groundwater.

*57 I. OWNED-PROPERTY EXCLUSION
Among the defendants' many contentions, London Market and Allstate Insurance contend that, as to the Resistoflex facility, there is no evidence that the contaminated soil at this site has caused any off-site property damage. Moreover, since damage at this site is presently confined to plaintiff's own property, the "owned-property" exclusion contained in defendants' policies with plaintiff bars coverage. Defendants maintain that the only evidence of off-site pollution relates to the Essex Fells claim for which remediation expenses have already been allocated.
Most Comprehensive General Liability ("CGL") policies, such as those involved in this case, exclude coverage for damage to property owned, occupied or rented by the insured. These policies, however, will generally afford coverage for environmental cleanup related to damage to third-party property. State v. Signo Trading Intern., Inc., 130 N.J. 51, 612 A.2d 932 (1992). Certainly coverage for remediation expenses is appropriate where on-site pollution causes off-site contamination. See Gerrish Corp. v. Universal Underwriters Ins. Co., 947 F.2d 1023 (2d Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992); Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d. 1551 (9th Cir.1991). For example, where contaminated groundwater has migrated to another's property, plaintiff may be entitled to recover costs associated with removing the source of the contamination. CPS Chemical v. Continental Ins., 222 N.J. Super. 175, 536 A.2d 311 (App.Div. 1988); Broadwell Realty Inc. v. Fidelity & Cas. Co., 218 N.J. Super. 516, 528, 528 A.2d 76 (App.Div. 1987).
The problem in the present case is that plaintiff is seeking coverage for cleanup costs restricted to soil and groundwater contamination absent evidence of damage to off-site property. Plaintiff contends that it may be subject to substantial future expenses unless the pollutants on its property are removed. Defendants, in turn, rely on State v. Signo Trading Intern., Inc., supra, in which the Supreme Court determined that where a party cannot show actual damage to a third party interest, coverage is *58 ordinarily excluded. Future damages are not covered. 130 N.J. at 64, 612 A.2d 932. However, plaintiff contends that groundwater contamination is not damage to property owned by the insured but rather damage to the property of another. Thus, groundwater is not subject to the "owned-property" exclusion.
Prior to the Supreme Court's decision in Signo Trading, a number of New Jersey cases determined that coverage was not excluded for groundwater contamination, nor when the contamination was limited to the insured's property, so long as off-site property was imperiled. Broadwell Realty Inc. v. Fidelity & Cas. Co., 218 N.J. Super. 516, 526, 528 A.2d 76 (App.Div. 1987); Woodsum v. Pemberton Tp., 172 N.J. Super. 489, 503, 412 A.2d 1064 (Law Div. 1980), aff'd, 177 N.J. Super. 639, 427 A.2d 615 (App.Div. 1981).
In Broadwell, hazardous substances leaked from a number of underground storage tanks on a realty company's premises and subsequently spread to adjacent property. The appellate court held that "the costs of preventive measures taken by Broadwell on its own property in response to [a] DEP directive which were designed to abate the continued flow of contaminants onto adjacent lands are recoverable under the policy." 218 N.J. Super. at 525, 528 A.2d 76. However, those expenses related solely to the Broadwell site itself rather than to prevent off-site contamination, which was deemed to be subject to the owned-property exclusion and not covered. Id. at 528, 528 A.2d 76. In Broadwell, the court noted that "harm to the state, by reason of the discharge of pollutants into its streams, and to others was continuing and ongoing. Further, peril was both imminent and immediate." Id. at 527-28, 528 A.2d 76. Moreover, the parties were not required "to calmly await further catastrophe" before taking action. Id. at 526, 528 A.2d 76.
Other cases have held that response costs, even if limited to the polluted site itself, were covered under general liability policies where such expenses are related to third-party damage claims. Township of Gloucester v. Maryland Cas. Co., 668 F. Supp. 394 *59 (D.N.J. 1987); CPS Chemical v. Continental Ins., 222 N.J. Super. 175, 185, 536 A.2d 311 (App.Div. 1988); Reliance Ins. Co. v. Armstrong World Indus., Inc., 259 N.J. Super. 538, 614 A.2d 642 (Law Div. 1992).
The narrow question presented in this case is whether the owned-property exclusion applies where there is evidence of groundwater contamination but no evidence of off-site damage. Defendants contend that groundwater belongs to the property owner, and thus the contaminated soil and groundwater at Resistoflex is subject to the owned-property exclusion.
A number of courts which have addressed this issue have determined that groundwater is not subject to the owned-property exclusion contained in most CGL policies. Intel Corp. v. Hartford Acc. & Indem. Co., supra; Gerrish Corp. v. Universal Underwriters Ins. Co., supra; LaSalle Nat. Trust, N.A. v. Schaffner, 818 F. Supp. 1161 (N.D.Ill. 1993); Patz v. St. Paul Fire and Marine Ins. Co., 817 F. Supp. 781, 783 (E.D.Wis. 1993); Maryland Cas. Co. v. Wausau Chemical Corp., 809 F. Supp. 680, 693 (W.D.Wis. 1992); Claussen v. Aetna Casualty & Sur. Co., 754 F. Supp. 1576, 1579 (S.D.Ga. 1990); United States Aviex Co. v. Travelers Ins. Co., 125 Mich. App. 579, 336 N.W.2d 838 (1983).
In New Jersey, one trial court, with the validation of an appellate court, has determined that there is no proprietary interest in groundwater, only a right of beneficial use. Woodsum v. Pemberton Tp., 172 N.J. Super. 489, 503, 412 A.2d 1064 (Law Div. 1980), aff'd, 177 N.J. Super. 639, 427 A.2d 615 (App.Div. 1981); see also Meeker v. City of East Orange, 77 N.J.L. 623, 638-39, 74 A. 379 (E & A 1909). This view has been adopted by numerous jurisdictions across the country. See Cherry v. Steiner, 543 F. Supp. 1270 (D.Ariz. 1982); Gallerani v. United States, 41 F. Supp. 293, 294 (D.Mass. 1941); AIU Ins. Co. v. FMC Corp., 51 Cal.3d 807, 274 Cal. Rptr. 820, 799 P.2d 1253 (1990); Town of Chino Valley v. City of Prescott, 131 Ariz. 78, 82, 638 P.2d 1324, 1328 (1981), reh'g denied, 457 U.S. 1101, 102 S.Ct. 2897, 73 L.Ed.2d *60 1310 (1982); State v. New York Central Mutual Fire Ins. Co., 147 A.D.2d 77, 542 N.Y.S.2d 402 (App.Div. 1989).
Contrary to the Woodsum holding, another trial court has ruled that the owned-property exclusion under review bars coverage for contamination of the groundwater. Reliance v. Armstrong World Ind., 265 N.J. Super. 148, 625 A.2d 601 (Law Div. 1993). In Reliance, the court apparently determined that since there is no legislative authority creating a trustee status between the state and its citizenry, "property interest in groundwater is clearly an interest held by the owner of the recorded title to the surface land...." Id. at 162, 625 A.2d 601.
Our Legislature, however, has determined that certain toxic substances "are a significant and unnecessary source of water pollution and groundwater contamination," and that pollution of the state's groundwater continues to endanger public health, ecological values and other public and private uses of water. See N.J.S.A. 58:10A-15; N.J.S.A. 58:10A-2. Accordingly, and contrary to the holding in Reliance, N.J.S.A. 58:10-23.11a, N.J.S.A. 58:10-23.11b(m) and (u), and N.J.S.A. 58:1A-2  58:1A-17 do indeed impose trustee status on the state with respect to a public resource such as groundwater. See also CPS Chemical v. Continental Ins., 222 N.J. Super. 175, 185, 536 A.2d 311 (App.Div. 1988).
Furthermore, it is the public "policy of this State to eliminate the introduction of these toxic chemicals into the groundwater of this State." N.J.S.A. 58:10A-15. This includes trichlorethylene (TCE), the very toxic chemical involved in this case. N.J.S.A. 58:10A-16(c). A number of other provisions make clear that the state, as trustee, has undertaken to protect its groundwater resources from hazardous material. N.J.S.A. 58:10-23.11c; N.J.S.A. 58:10A-18  58:10A-6; and N.J.S.A. 58:10-23.11d2b(7).
On the basis of this statutory authority, I respectfully disagree with the assertion in Reliance that there is no specific legislative authority creating a trustee status between the state and its citizens as to groundwater and that "groundwater is clearly an interest held by the owner of the recorded title of the surface *61 land." Reliance, 265 N.J. Super. at 162, 625 A.2d 601. Thus, for purposes of the owned-property exclusion clause contained in CGL policies such as those in this case, groundwater is not simply the proprietary interest of the title holder. As observed in Woodsum, "[g]round water does not stand still. It flows or trickles or runs or oozes through the land from one place to another.... For these reasons, it is reasonable and practical to apply rules to the use of water which are different from rules applied to the use of real property." Woodsum v. Pemberton Tp., supra, 172 N.J. Super. at 502, 412 A.2d 1064.
To analyze the question of real property ownership in more rudimentary terms, a dictionary defines "groundwater" as "water beneath the earth's surface between saturated soil and rock that supplies wells and springs." The American Heritage Dictionary 579 (2d College ed. 1985). "[S]aturate," in turn, is defined as "to imbue or impregnate thoroughly." Id. at 1092. Thus, by its very nature, groundwater is a migratory fluid which uncontrollably seeps through porous soil particles. Therefore, because under such circumstances it is nearly impossible to naturally contain such a water source, as well as any contaminants or pollutants subsumed within its path, it would be unreasonable simplistically to assign ownership rights strictly on the basis of water that may only momentarily be coursing and flowing below a property's surface.
Relevant to this discussion is the case of Signo Trading, supra, where the Supreme Court held that a CGL policy insures only for third-party damage and not for the threat of such damage; thus, the owned-property exclusion precludes coverage for damage to the insured's own property. Id. 130 N.J. at 63-64, 612 A.2d 932.
In Signo Trading, the Supreme Court did not explicitly preclude the possibility that the state might be the owner of groundwater. In fact, the court did discuss the case of State v. New York Central Mutual Fire Ins. Co., 147 A.D.2d 77, 542 N.Y.S.2d 402 (App.Div. 1989), which ruled that groundwater is a natural resource protected by the state as trustee for its people. However, *62 the Court declined to follow the New York case, since in Signo Trading there was no evidence of any migration of pollutants into state-controlled waters. Moreover, the policy at issue in Signo Trading indemnified the insured only for damages to third-party property, not the threat of such damage. 130 N.J. at 65, 612 A.2d 932.
Here, based on the fact that groundwater is inherently migratory, should plaintiff prove the actual existence of pollutants in the groundwater as well as a substantial risk that a third-party's property will be contaminated, policies insuring the Roseland site would be obligated to afford coverage for damages. See Ayers v. Jackson, 106 N.J. 557, 525 A.2d 287 (1987) (residents entitled to damages against township for costs of medical surveillance for future symptoms of disease subsequent to exposure to pollutants even in absence of quantifying risk of future injury or disease, since expert medical testimony established existence of significant risk). Naturally, such fact-sensitive issues are more appropriately determined by a jury.
In the present case, so long as there is actual contamination to groundwater as may be determined from the factual and expert testimony presented, and the testimony also establishes to a reasonable degree of certainty that the groundwater is likely to migrate and cause off-site damage, coverage should not be barred. In such a case, costs necessary "to prevent imminent and immediate future damages" may be appropriate. Signo Trading, 130 N.J. at 64, 612 A.2d 932.
In short, this determination under New Jersey law must be made in the context of a factual presentation. Thus, to the extent that Reliance does not afford coverage in case of actual contamination to groundwater where the probability of harm to off-site property is demonstrated, I am in disagreement with that decision.
As to the Salinas, California facility, Continental Casualty Co., Hartford Accident and Indemnity Co. and London Market *63 Insurers contend that since this site involves no off-site migration to or contamination of common waters and no threat to third-party property, their policies do not afford coverage. Continental states that a government agency has confirmed that merely localized, non-migrating surface water is involved and not common groundwater. Indeed, the motion papers do not present any evidence of actual damages to any off-site property.
In California the law is even more resolute on the issue of coverage for groundwater pollution than New Jersey. The California Supreme Court has determined that property owners do not own the groundwater. AIU Ins. Co. v. FMC Corp., 51 Cal.3d 807, 274 Cal. Rptr. 820, 799 P.2d 1253 (1990). There, the owned-property exclusion does not bar coverage for expenses incurred as a result of groundwater contamination. See, e.g., Intel Corp. v. Hartford Acc. & Indem. Co., 692 F. Supp. 1171 (N.D.Cal. 1988), aff'd in part, rev'd in part, 952 F.2d 1551 (9th Cir.1991). Thus, in California, coverage is afforded in cases of groundwater contamination even without evidence of actual or potential damage to off-site property.
Accordingly, since there remains a factual dispute under New Jersey and California law as to whether there has been groundwater contamination at the Roseland and Salinas facilities, defendants' motion to dismiss based on the owned-property exclusion provisions of their policies with the insured are denied.

II. AFTER-ACQUIRED SUBSIDIARY
Next, defendant Home Insurance Company contends that it owes neither a defense nor indemnification obligation to plaintiff for any claims arising out of the Resistoflex facility because plaintiff acquired Resistoflex several years after the last policy of insurance issued by Home expired.
From the mid-1960's through the 1970's, Home Insurance issued a number of policies covering plaintiff's operations. The last policy was issued on January 1, 1976. Some two years after this date, plaintiff acquired the Resistoflex facility.
*64 Plaintiff refers to a provision in the 1976 insurance policy with Home which states that the definition of "named insured" is "[a]s stated in Item 1 of the Declarations forming a part hereof and/or subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted and of which prompt notice has been given to the company...." (emphasis added).
According to plaintiff, the term "hereafter constituted" should be interpreted to mean that Home's policy covers plaintiff and any business entities plaintiff acquires subsequent to the policy expiration date. That is, the definition of named insured anticipates coverage for the future acquisition of subsidiaries by plaintiff such as Resistoflex. I disagree.
As a matter of public policy, an insurance policy is a contract of adhesion which consistently has been construed against insurance companies. Zuckerman v. National Union Fire Ins., 100 N.J. 304, 320, 495 A.2d 395 (1985). Such an agreement must be determined in the context of the circumstances under which it was entered into and it must be accorded a meaning in keeping with its express general purpose. Even where the intention is doubtful or obscure, the most fair and reasonable meaning should be adopted. See West Caldwell v. Caldwell, 26 N.J. 9, 24-25, 138 A.2d 402 (1958).
In the context of this case, I cannot interpret the phrase "hereafter constituted" to mean that the insurer would provide coverage for any business entity plaintiff acquired after the policy lapsed and well into the future. Although the phrase "hereafter constituted" is somewhat ambiguous, I do not see how plaintiff could reasonably have expected that all of the business entities it acquired after the policy expired could be covered by that policy. A fairer and more reasonable interpretation of the term "hereafter" would be that the insurer will provide coverage for acquisitions after the policy commencement date and during the policy period. Under these circumstances, the insurer would be able to reassess the insured risk and adjust its premiums accordingly. *65 Adopting plaintiff's view creates the potential for significant abuse. For example, as defendant Home states: "such a construction would permit a company to acquire an unrelated, liability laden entity, secure in the knowledge that its insurer would bear the litigation costs."
Further, I cannot agree that insurance coverage for subsidiaries acquired after termination of the policy period was within the contemplation of the parties when they entered into the agreement. This is a policy which covered commercial risks and "involved parties on both sides of the bargaining table who were sophisticated with regard to insurance." See Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 39, 548 A.2d 188 (1988). Plaintiff cannot be considered an "unschooled or unwary policyholder." Owens-Illinois v. United Ins. Co., 264 N.J. Super. 460, 488, 625 A.2d 1 (App.Div. 1993). Rather, plaintiff is deemed to be aware that a change in the insured risk, whether by sale or acquisition, requires prompt notice to the insurer and would likely result in a change in the premium. This notice requirement is meaningless where the insured unilaterally increases the risk years after the policy expires. Since Resistoflex was acquired after the policy issued by Home terminated, Home's motion for partial summary judgment as to the Resistoflex facility is granted.
Continental Casualty's motion for summary judgment is similarly granted. Continental's coverage extended through 1974. Resistoflex was acquired four years later. Plaintiff contends that named insureds in the Continental policy included "any affiliated or subsidiary companies in which the named insureds have a financial control and any trade name under which they now operate or may operate in the future." Plaintiff argues that Continental must provide coverage since Resistoflex was a facility plaintiff operated "in the future."
First, the term "subsidiary companies in which the named insureds have a financial control" clearly relates to present, not future financial control. Thus, UMC would have to have had financial control of Resistoflex during the policy period for it to *66 now be entitled to coverage. Second, UMC had no connection, interest, involvement or relationship with Resistoflex when it was insured by Continental. Thus, it could not have been within the reasonable contemplation of the parties that Continental's policy would cover UMC for environmental claims four years after the policy expired. Accordingly, Continental's motion for summary judgment is granted.

III. JUSTICIABILITY
Defendants Old Republic, Continental Casualty and Home Insurance seek summary judgment contending that since other policies in force are more than sufficient to cover plaintiff's stated damages, there is no justiciable controversy that would implicate their excess coverage.
Generally, to sustain a declaratory judgment action, there must be a justiciable controversy between the parties where the operative facts are not prospective, uncertain or contingent and the court is not asked to render what is essentially an advisory opinion. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937); U.S.A. Chamber of Commerce v. State, 89 N.J. 131, 445 A.2d 353 (1982); N.J.S.A. 2A:16-52 et seq.; R. 4:42-3. No reported New Jersey case has dealt with this precise issue. One New York case addressing this question has found that declaratory relief is appropriate even if the insurer is an excess liability insurer. Post v. Metrop. Cas. Ins. Co., 227 App.Div. 156, 237 N.Y.S. 64 (1929). In Post, the insurer was obligated to pay judgments in excess of $25,000. However, the court denied the excess insurer's motion to dismiss, reasoning that since the insurer admitted that judgments for more than $25,000 would be recovered, a real controversy existed.
In the present case, Old Republic's policy provides that it is liable "only after the underlying umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability...." The underlying umbrella liability *67 is $50 million. Old Republic argues that based on plaintiff's stated damage claim of $25 million, it is likely that its policy will never be reached; thus, there is no real controversy. I agree. In their insurance contract, the parties clearly contemplated that Old Republic would make no payment until the first $50 million is paid by underlying policies.
Plaintiff's claim that its damage estimate involves projected costs and that substantial claims may arise in the future is based on prospective, uncertain or contingent events. There is no question that Old Republic is obligated to provide coverage above the limits of the underlying coverage. See Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 37, 548 A.2d 188 (1988). However, there is nothing in the present record that would justify the conclusions that the underlying insurance is insufficient. Indeed, more than double what plaintiff seeks must be paid before Old Republic's policy is implicated. The same is not true as to Home Insurance, whose policies rank next in line for several years of coverage; so too with Continental Casualty, another excess carrier who is already in this case as a primary CGL insurer on policies spanning approximately 10 years. Their "drop-down" distances are much shorter than Old Republic's  making their potential liability real, not hypothetical.
Taking into account Old Republic's relative remoteness in the hierarchy of coverage and the fact that its presence in the case involves the defense of only one policy covering a single year, I find there is no justiciable controversy between Old Republic and the insured. Accordingly, its motion for summary judgment is granted. In the event plaintiff's damages consume the amount of coverage available through underlying insurance, this court will retain jurisdiction to assess Old Republic's liability under its excess policy with the insured.

IV. DISCLOSURE OF SETTLEMENTS
Defendant Allstate Insurance Company, a non-settling excess insurer, moves for disclosure of the settlement terms *68 between plaintiff UMC and those defendants who settled with plaintiff. UMC and a number of settling defendants oppose the motion primarily on grounds of confidentiality.
Allstate contends that disclosure is likely to lead to the discovery of relevant, admissible evidence. Bottaro v. Hatton Associates, 96 F.R.D. 158 (E.D.N.Y. 1982); see also, Morse/Diesel Inc. v. Trinity Industries, Inc., 142 F.R.D. 80 (S.D.N.Y. 1992) (movant must establish and court must find that information sought is reasonably calculated to lead to the discovery of admissible evidence). According to Allstate, these settlement terms are relevant because the total limits of the policies issued by just three of the settled carriers exceed the total amount plaintiffs have incurred in connection with the cleanup and remediation efforts at three major sites. Without full and complete disclosure, Allstate has no way of knowing whether plaintiffs are forcing trial where all sums plaintiffs claim they are entitled to recover have already been satisfied via settlement with other parties.
Defendant's other reasons to compel discovery of the settlement are to determine what effect the settlement has on issues such as (a) the assignment of claims to particular years of underlying coverage; (b) the applicability and possible exhaustion of the underlying limits of liability; (c) the extent of the releases granted to settling carriers; (d) the amount of damages alleged by UMC; and (e) the actual contribution, if any, by the excess policies.
Plaintiff argues that the terms of its settlements with the primary insurance companies are not relevant to the liability of the excess carrier. Union Indemn. Ins. Co. v. Certain Underwriters at Lloyd's, 614 F. Supp. 1015 (S.D.Tex. 1985) (the excess carriers' liability cannot be discharged or in any way affected by the primary carrier's settlement); Deblon v. Beaton, 103 N.J. Super. 345, 247 A.2d 172 (Law Div. 1968).
Apparently Allstate believes it is entitled to know the terms of plaintiff's settlements with the settling carriers so as to insure that plaintiff is not receiving a "windfall" and to insure that all underlying *69 coverage has been properly exhausted. Neither contention has merit. As plaintiff observes in its brief:
As long as the underling liability exceeds the primary limits in a vertical exhaustion, it does not matter how much the primary paid plaintiffs. If there is any dollar difference between the primary layer of coverage and the amount of the settlement, plaintiffs will have to pay that difference before expecting to obtain any reimbursement from excess insurance companies since plaintiffs do not contend that these are `drop down' policies. It is therefore irrelevant what the exact dollar figure was in the settlement.
Thus, an excess carrier is entitled to a credit, not from the primary carrier's settlement, but from the amount allocable to the primary under its policies. In other words, the excess carrier is entitled to a credit for the full amount of the primary carrier's coverage before it is required to pay any cleanup expense. This credit has nothing to do with the details of the settlements between UMC and the other insurers. Therefore, an excess carrier has no need to know the terms of the settlement between plaintiff and a settling primary carrier.
Allstate's next contention that it is entitled to disclosure based on its claim for contribution is unpersuasive. A non-settling defendant's right to contribution is not an established right in our state. Indeed, in Childs v. N.J. Mfrs. Ins. Co., 108 N.J. 506, 515, 531 A.2d 723 (1987), the Supreme Court expressed "serious doubts that any right of contribution exists" between non-settling defendants and those who have settled. Accordingly, the mere claim for contribution by a non-settler is not a sufficient basis for disclosure of the terms of settlements reached by other parties.
Finally, as the New Jersey Supreme Court has noted, the "settlement of litigation ranks high in our public policy." Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990) (quoting Jannarone v. W.T. Co., 65 N.J. Super. 472, 168 A.2d 72 (App.Div.), certif. denied, 35 N.J. 61, 171 A.2d 147 (1961)). To promote this policy, settlement negotiations are generally deemed confidential and the admissibility of evidence relating to settlement negotiations is restricted. Evid.R. 408 specifically provides that "evidence of statements or conduct by parties or their attorneys in settlement negotiations" is inadmissible at trial. The grounds most commonly *70 advanced for excluding evidence of settlements are the lack of relevance and the social desirability of encouraging the settling of disputes. Winfield, etc., Corp. v. Middlesex, etc., Corp., 39 N.J. Super. 92, 101, 120 A.2d 655 (App.Div. 1956); Czuj v. Toresco Enters., 239 N.J. Super. 123, 128, 570 A.2d 1049 (Law Div. 1989). See also Bank of America National Trust & Savings Ass'n v. Rittenhouse, 800 F.2d 339, 345 (3d Cir.1986); Cook v. Yellow Freight System, Inc., 132 F.R.D. 548, 554 (E.D.Cal. 1990) (there is a "strong public policy favoring the confidentiality of attempts to voluntarily resolve disputes"); Bottaro v. Hatton Associates, supra, Evid.R. 408; McCormick on Evidence (4th ed. 1992), § 266.
Confidentiality is the key component to settlement negotiations. Indeed, as noted by plaintiff, confidential negotiations led to the resolution of many of its disputes with several insurers in this case. Also, a number of defendants opposing Allstate's request for disclosure claim that their agreements could not have been reached without the understanding that their terms would remain confidential.
In particular, Utica Mutual Insurance Company (Utica), which has settled with plaintiff, sets forth a number of problems posed by disclosure. Utica is in competition with other insurers, including other defendants in this action to provide liability insurance for commercial accounts. Insurers and insureds nationwide engage in disputes over the existence of liability coverage under recently-enacted environmental statutory schemes, with remediation costs running in the hundreds of millions of dollars. The insurer:
"[C]annot permit settlements with one policyholder to serve as a model for settlements with others, nor can it allow its competitors to become familiar with the terms on which it will compromise environmental disputes. Were this Agreement to become known to other insurers, those competitors would have an advantage in litigation with other policyholders in environmental coverage disputes. They could use that information to anticipate and frustrate [the insurer's] settlement strategy; to develop their own settlement proposals, with a view toward reaching a bilateral settlement with a policyholder ahead of [the insurer]; or to use the information, in multi-lateral negotiations among insurers, in their efforts to require [the insurer] to shoulder a larger proportion of any liability."
[Utica Mutual Insurance Company's Brief at 9.]
*71 Clearly, ordering disclosure of settlements already reached in this case would not only jeopardize those settlements but would chill and deter other parties from entering into confidential discussions to settle their disputes without a lengthy trial. Where settlement terms are not free from disclosure, neither side has much of an incentive to settle early. Moreover, disclosure could impair the ability of the court to use the mediation process as a means of managing and resolving complex litigation.
Certainly the situation would be otherwise if the settlements in this case had been matters of public record. R. 1:2-1, 1:2-2; Zukerman v. Piper Pools, 256 N.J. Super. 622, 627, 607 A.2d 1027 and n. 3 (App.Div. 1992). However, private agreements and confidential negotiations are treated differently. In Zukerman, it was observed that "where the terms of a settlement are embodied in a private agreement and not spread on the record of court proceedings, a [party] has no right to obtain disclosure from parties who wish to protect confidentiality." Id. at 627, 607 A.2d 1027 n. 3. Similarly, Allstate, the non-settler, has no right to disclosure of settlement terms that the settling parties wish to preserve confidential.
Accordingly, in the interest of encouraging the settlement of disputes and for reasons of confidentiality, Allstate's motion for disclosure of the terms of plaintiff's settlement with other insurers is denied.